IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| BRIAN ANDERSON | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No: WDQ 11-cv-1188 |
| | : |
| THE RELIANCE STANDARD LIFE | : |
| INSURANCE COMPANY | : |
| | : |
| and | : |
| | : |
| THE APPTIS, INC. GROUP LONG TERM | : |
| DISABILITY PLAN | : |
| | : |
| Defendants. | : |

**MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF PLAINTIFF'S MOTION TO COMPEL DISCOVERY**

Plaintiff, by and through counsel, in accordance with Rule 37 of the Federal Rules of

Civil Procedure and Local Rule 7of this Court, hereby moves to compel discovery in this matter

and, in so doing, states the following:

ADMINISTRATIVE HISTORY:

Plaintiff is seeking a declaratory judgement to his right to disability benefits payments

under The Apptis, Inc. Group Long Term Disability Plan which is insured by The Reliance

Standard Life Insurance Company (Hereinafter, "Reliance Standard") and administered by

Reliance Standards' sister company, Matrix Absence Management, Inc.

Plaintiff suffers from degenerative disc disorders of the back, failed back syndrome,

radiculopathy, obstructive sleep apnea, plantar fasciitis/tear among other conditions in addition

to associated chronic pain, fatigue, cognitive impairment, and other conditions, symptoms, and

impairments.

Plaintiff was an employee at Apptis, Inc. serving as a Lead Security Engineer at the time when he became disabled on 3/19/07 .

Plaintiff was paid long term disability benefits until 1/15/10 on which date his benefits were terminated.

Plaintiff obtained counsel and filed  a comprehensive appeal filed on 6/11/10  which included medical, functional capacity, vocational, and other evidence.

Reliance Standard denied long term disability benefits again on 1/20/11.

Plaintiff filed a second appeal was file on 6/12/08 which included additional medical, functional capacity, and other evidence which was ignored by Reliance Standard and has led to the instant lawsuit.

The pertinent plan contains a discretionary clause effecting the abuse of discretion review standard for this case.

APPLICABLE LAW:

The Supreme Court's decision in *Metlife v. Glenn*, 128 S.Ct. 2342 (2008) has changed the discovery limitation previously held in ERISA cases.  The *Glenn* decision requires that courts modify their analysis of the scope of review of claim decisions under ERISA.  *Glenn* states that where a insurer's funds are at stake, it represents an inherent conflict of interest which must be taken into consideration.  128 S.Ct. 2343, 2348 - 9.

The *Glenn* decision specifically lists relevant evidence which would affect the weight of the conflict.  This evidence includes instances where an insurance company administrator has a history of biased claims administration, isolation of claims personnel from those interested in

2

company finances, and imposition of management checks that penalize in accurate decision-making irrespective of whom the inaccuracy benefits.  *Glenn*, at 2351.  This type of evidence rarely appears in a claim file and can only be obtained via the discovery process.

The Supreme Court explained in *Glenn* that "any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tie-breaking factors inherent or case-specific importance.  *Id*.

Recently, the first Fourth Circuit authority supporting discovery in abuse of discretion standard cases has been rendered in *Clark v. Unum Life Ins. Co. of America*, 2011 WL 3204673 (D.Md. 7/27/11).

There has been a conflict of authority in addressing the new requirements concerning discovery following the *Glenn* decision.  It was stated in *Marrs v. Motorola, Inc.*, 577 F.3d 783 (7th Cir. 2009) that the "*likelihood* that the conflict of interest influenced the decision is therefore the deciding consideration" *Id*. at 789 ostensibly opens the door to discovery on this issue as was held in the subsequent case of *Garvey v. Piper Rudnick LLP Long Term Disability Insurance Plan*, 2009 WL 3260010 (N.D.Ill. 10/9/09) which held that discovery concerning compensation of consulting physicians involved in reviewing and denying the claim since terms of employment for an administrator's employees are discoverable since such employment terms might determine how such employees slant their decisions.  *Id*. at *8 citing *Marrs* at 789. Similar, it was ruled that *Glenn* contemplates that discovery be undertaken incases where a conflict exists.  *Murphy v. Deloitte & Touche Ins. Plan*, 2010 WL 3489673 (10th Cir. 9/8/10).

For the purpose of allowing discovery, *Glenn* was interpreted in *Baxter v. Sun Life Assur. Co. of Canada*, 2010 WL 2011633 at *4 (N.D.Ill. 5/20/10) noting that it would be difficult for

the parties to test the impact or weight of the conflict of interest based solely on the administrative record without the benefit of discovery in appropriate cases.  Similarly, without discovery, plaintiffs would be severely hindered in their ability to obtain evidence to show the significance of the conflict of interest.  *Pemberton v. Reliance Standard Life Ins. Co.*, 2009 WL 1044891 (E.D.Ky. 1/13/09).

Some jurisdictions have allowed expanded discovery including (1) incentive, bonus, or reward systems, formal or informal, for claim review employees; (2) contractual connections between the insurer and reviewers utilized in the subject claim along with annual financial payments made by the insurer to the reviewing company; (3) statistical data regarding the number of claim files sent to the reviews and number of denials which resulted; (4) statistical data concerning the times the reviewers found claimants able to work in at least a sedentary occupation or found a claimant to be not disabled; and (5) documentation of administrative processes designed only to check the accuracy of grants of claims (limited to claim guidelines actually consulted in the subject claim).  *Busch v. Hartford Life and Accident Ins. Co.*, 2010 WL 3842367 (E.D.Ky. 9/27/10).

Given the cumulative reasoning from the pertinent cases cited, it is apparent that in light of the recognized conflict of interest in these scenarios, the plaintiff should have the opportunity to supplement the record through discovery aimed at challenging the objectivity and honesty of the plan administrator's claim decision.  If such information were solely restrict to the claim file contents, such information could never discerned.  Given the administrator's sole control over the claim file, it is certain that no such information would ever be disclosed for a claim beneficiary to bring a meritworthy challenge concerning underlying factors which illustrate the

nature of the conflict of interest inherent in such claims decisions.

The discovery requests made by the Plaintiff are narrowly tailored to the issue of the Plan Administrator's conflict of interest. The queries concerning the medical reviewer reporting and associated compensation strike to the heart of the conflict of interest. As stated in *Glenn*, financial relationships are suitable areas for conflict of interest analysis. Based on this reasoning, the claim administrator was ordered to disclose the number of claims referred to third party firms and the amount and rate of compensation paid for investigation and/or review services in *Achorn v. Prudential Ins. Co. of Am.*, 2008 U.S.Dist.LEXIS 73832, *17 - 18 (D.Me. 9/25/08). Discovery of financial incentives to deny claims was permitted in *Sampson v. Prudential Ins. Co. of Am.*, 2009 WL 24858 (E.D.Mo. 3/26/09). Similarly, in *Hogan-Cross v. MetLife*, 568 F. Supp.2d 410, 414 - 5 (S.D.N.Y. 7/31/08), discovery of compensation paid to employees and outside consultants involved in denying the claim was permitted. *See Also*, *Myers v. Prudential Ins. Co. of Am.*, 581 F.Supp.2d 904, 912, 914 - 5 (E.D.Tenn. 9/22/08)(permitting discovery of reviewing physicians's employer and the financial relationship between it and the insurer); *Sanders v. Unum*, 2008 WL 4493043 at *4 (E.D.Ark. 10/2/08)(allowing discovery of financial incentives to deny plaintiff's claim); *Wilcox v. Fargo Long Term Disability Plan*, 2008 WL 2873735 (9th Cir. 7/23/08)(discovery allowed as to whether any of the employees or consultants involved in deciding Plaintiff's claim had a financial incentive to deny the claim); *Pemberton v. Reliance Standard*, 2009 WL 89696 (E.D.Ky. 1/13/09)(discovery allowed into the contractual connections between the insurer and its third party reviewers including annual financial payments); *Benson v. Hartford Life and Accident Ins. Co.*, 2010 WL 2854242 (D.Utah 7/21/10)(allowing discovery of the relationship

and practices of insurer and third party review company); *Denmark v. Liberty Life Assurance Co. of Boston*, 566 F.3d 1 (1st Cir. 2009)(case remanded to allow targeted discovery concerning motivation behind plan administrator's decision); *Geer v. Hartford Life and Accident Co.*, 2009 WL 1620402 (E.D.Mich 6/9/09)(limited discovery regarding business relationship between administrator and person reviewing the claim as well as the history of claims made under policy for the past ten years); *Kruk v. Metropolitan Life Ins. Co., Inc.* (2009 WL 1481543 (D.Conn. 5/26/09)(allowing discovery of claims manuals and frequency of claims review), *Followed by Mergel v. The Prudential Life Ins. Co. of Am.*, 2009 WL 2844084 (S.D.N.Y. 9/1/09); *Hogan-Cross v. MetLife*, 568 F.Supp.2d 410, 415 (S.D.N.Y. 2008)(holding the existence, nature, extent, and effect of any conflict of interest were relevant considerations). Similarly, employee performance reviews were ordered to be produced in *Sullivan v. Deutsche Bank Americas Holding Corp.*, 2010 WL 391821 (S.D.Cal., 2/2/10).

The Plaintiff has also requested information concerning approval rates and payments received for consulting Defendants' consulting physicians. Similar requests have been found to be allowable in many courts. *See*, *Benson v. Hartford Life & Accid. Ins. Co.*, 2011 WL 285831 (D. Utah 1/28/11)(holding that discovery was appropriate concerning the relationship of third party vendor UDC and Hartford and all statistics of claims approvals/denials), *Kruk v. Metropolitan Life Ins. Co.*, 2010WL2161645 (D.Conn. 5/27/10)(holding that "The history of remuneration flowing to third-party service providers and the statistics concerning the number of claims reviewed in relation to the number of claims denied is now 'fair game' for discovery); *Thompson v. UBS Financial Services*, 2009 WL 5103284 (D.R.I. 12/18/09)(discovery allowed on claims handling practices); *McGahey v. Harvard University Flexible Benefits Plan*, 2009 WL

4729660 (D.Mass. 12/11/09) (inquiry allowed into number of reviews performed and statistics as to number of approvals made);  *Bird v. GTX, Inc.*, 2009 WL 5217007 (W.D.Tenn. 11/13/09)(permitted discovery into incentive/bonuses, contractual connections with reviewers, statistical data concerning reviews undertaken, results of reviews undertaken, and documentation of claims granted/denied); *Fisher v. Life Ins. Co. of N. Am.*, 2009 U.S.Dist.LEXIS 22487, *6 - 8 (S.D.Ind. 5/19/09) (allowing discovery relating to the relationship and compensation of claim reviewers, employee payment history, and relationship of LINA to third party reviewers and payments made).  Likewise, *Achorn*, *supra*, at *17 - 18 ordered disclosure of the number of claims that had resulted in a recommendation to deny or terminate benefits as well as the number that were actually denied.  *See Also*, *Wilcox* (discovery allowed as to defendant's long term disability claim approval and denial rates); *Santos v. Hartford Life Ins. Co.*, 2009 W: 1362696 (E.D.Cal. 5/14/09)(allowing discovery concerning documents evidencing cost savings or particularized types of claim denials, claims granting statistics, financial interest in medical review services, right to inquire of insurer as to reviewing doctors' tendencies for routine denial of claims, and the right to inquire of medical reviewers of knowledge of claim reserve amounts); *Pemberton*, *supra* (discovery allowed concerning statistical data regarding number of files sent for medical review and number of resulting denials); *McQueen v. Life Ins. Co. of N. Am.*, 2009 WL 197965 (E.D.Ky. 2009)(discovery allowed into insurer's history of biased decisions including statistical information about claim outcomes when submitted to insurers); *Kinsler v. Lincoln National Life Ins. Co.*, 2009 WL 2996723 (M.D.Tenn 9/21/09)(allowing discovery as to any incentive, bonus, or reward systems for claims employees, frequency of review by in-house consultants and particular numbers of reviews by third party consultants, as well as agreements

and correspondence between third party reviewers and the insurer).

Discovery has been extended to allow depositions of claim administrators to determine the effects of systemic bias on their decisions. *Kruk v. Metropolitan Life Ins. Co.*, 2010WL2161645 (D.Conn. 5/27/10);  *Bair v. Life Insurance Co. of N. Am.*, 2009 WL 4052189 (E.D.Pa. 11/20/09).  Similarly, discovery has been allowed to inquiry into whether employees have been penalized for inaccurate decisions favoring either the insured or the insurer.  *Hackett v. Standard Ins. Co.*, 2010 U.S.Dist.LEXIS 37136 (D.S.D. 4/14/10_)

Discovery has even been extended to third-party administrators to allow inquiry info retained oversight over the evaluation process and financial incentives to encourage plan administration to the employer's satisfaction.  *O'Bryan v. Consol Energy, Inc.*, 2009 WL 383401 at *4 (E.D.Ky. 2/11/09) citing *Mazur v. Pacific Telesis Group Comp. Dis. Benefits Plan*, 2008 WL 564796 (N.D.Cal. 2/28/08).

The list of additional cases continues to grow and include:  *Taylor v. SmithKline Beecham Corp.*, 629 F.Supp.2d 1032 (C.D.Cal. 2009); *Santos v. Quebecor World Longer Term Disability Plan*, 254 F.R.D 643 (E.D.Cal. 2009); *Bartholomew v. Unum Life Ins. Co.*, 579 F.Supp.2d 1339 (W.D.Wash. 2008); *Samples v. First Health Group Corp.*, 631 F.Supp.2d 1174 (D.Ariz. 2007); *Slusarski v. Life Ins. Co. of N. Am.*, 632 F.Supp.2d 159 (D.R.I. 2009); *Minton v. Deloitte and Touche USA LLP Plan*, 631 F.Supp.2d 1213 (N.D.Cal. 2009); *Walker v. Metropolitan Life Ins. Co.*, 585 F.Supp.2d 1167 (N.D.Cal. 2008); *Fowler v. AETNA Life Ins. Co.*, 615 F.Supp.2d 1130 (N.D.Cal. 2009); *Hays v. Provident Life and Accident Ins. Co.*, 623 F.Supp.2d 840 (E.D.Ky. 2008); *Gessling v. Group Long Term Disability Plan*, 639 F.Supp.2d 947 (S.D.Ind. 2009); *Denmark v. Liberty Life Assurance Co.*, 566 F.3d 1 (1st Cir. 2009).

Claims manuals and other information have been ordered to be produced in other cases involving discretionary review.   The MetLife claim manual and other procedural documents in addition to performance evaluations of medical personnel involved with review of the pertinent claim (all for a five year period) were ordered in *Sullivan v. Prudential Ins. Co. of Am.*, 233 F.R.D. 573 (C.D. Ca. 2005); *See also Kruk v. Metropolitan Life Ins. Co.*, 2010WL2161645 (D.Conn. 5/27/10).  In *Hughes v. Cuna Mutual Group*, 257 F.R.D. 176 (S.D.Ind. 2009) the court required production of claim procedure manuals, personnel compensation information and criteria in addition to claim payment histories .Claims manuals and procedures were produced in *Kalp v. Life Insurance Co. of N. Am.*, 2009 WL 261189 (W.D.Pa. 2/4/09); *Alexander v. Hartford Life and Accid. Ins. Co.*, 2008 WL 906786 (N.D.Tx 4/3/08) citing *Griffin v. Raytheon Co. LTD Plan No. 558*, 2005 WL 4891214 (N.D.Tx. 8/31/05).  In particular, a claim manual is subject to disclosure pursuant to 29 U.S.C.§ 1024(b)(4) and subject to sanctions pursuant to 29 USC § 1132(c).  *Mondry v. American Family Mut. Ins. Co.*, 557 F.3d 781 (7th Cir. 2008).

 Excellent guidance concerning this issue has been provided in *Baxter v. Sun Life Assur. Co. of Canada*, 2010 WL 2011633 (N.D.Ill. 5/20/10) which held that it is difficult for a court to measure the conflict of interest based solely on the administrative record without benefit of discovery in appropriate cases.  The court ordered production regarding approval/denial/termination of benefits as being relevant to the issue of bias in the claim review process in addition to information of the relationship between a third party medical reviewer and the insurer and the employment status of reviewing physicians employed by the medical review company.

PERTINENT DISCOVERY REQUESTS, ANSWERS, AND RESPONSES

The Plaintiff served Interrogatories and Requests for Production of Documents (Attached Hereto as Exhibits 1 and 2 respectively) on Defendant Reliance Standard on 7/17/11 with Defendant responding on 8/26/11 (Responses to Interrogatories attached hereto as Exhibit 3 and Responses to Requests for Production of Documents attached as Exhibit 4), all of which, include the following:

*Interrogatories*

**Interrogatory No. 1:** Explain the relationship among the corporate entities Reliance Standard Insurance Company, Matrix Absence Management, and the Delphi Group.  Please include all details of ownership including stock  holdings, partnerships, controlling authority, subsidiary status, and all other ways in which these companies may be related.

Defendant's Answer: Reliance Standard Life Insurance Company is a subsidiary of Reliance Standard Life Insurance Company of Texas, which is a wholly owned subsidiary of Delphi Financial Group, Inc.  Matrix Absence Management was the third party claim administrator for claims under the group LTD policy, but Reliance Standard retained authority over the final decision.

Plaintiff's Response: This is a partial answer which does not address the status of Matrix Absence Management.  Delphi Financial Group includes several subsidiaries including Reliance Standard Life Insurance Company, **Matrix Absence Management, Inc**., and Safety National Casualty Corporation as reflected in their website at www.matrixcos.com.  (See Exhibit No. 5 for Matrix Companies information). Therefore, Defendants' answer is substantially incomplete and evasive.

**Interrogatory No. 2:**  Provide the total number of disability claims referred to the Matrix

Absence Management for the performance of disability claim administration by Reliance

Standard Life Insurance Company during the years 2007 - current inclusive listed on an annual

basis.  Further state for each year listed in the response how many of the stated cases found a

claimant suffering from restrictions or limitations and/or unable to perform work

<u>Defendant's Answer:</u> Defendant objects to plaintiff's interrogatory on the grounds that it is

overly broad in time and in scope and not reasonably calculated to lead to the discovery of

admissible evidence.  In addition, defendant objects on the grounds that the request is unduly

burdensome as defendant does not maintain the information sought regarding claims referred to

Matrix Absence Management and it would require a manual review of each claim file to obtain

such information.

<u>Plaintiff's Response:</u> Defendant's answer to Interrogatory No. 1 failed to disclose that Matrix

Absence Management, Inc. is a sister company of Reliance Standard Insurance Company and a

fellow subsidiary of Delphi Financial Group.  Therefore, referrals and monies paid to Matrix

Absence Management are carefully tracked within the same corporate structure.  Should

Defendant not disclose this information, Plaintiff requests that this Court order a deposition of a

designated corporate representative for this purpose.

Such information is highly relevant as companies with the same ownership are working

toward the same end.  Therefore, a separate administrating company (Matrix) will be working in

concert with the insurer (Reliance).  Such concert of effort constitutes a complete conflict of

interest.

**Interrogatory No. 3:**   With respect to the total number of disability claims identified in the

answer to Interrogatory No. 2 above, provide a total of all monies paid to Matrix Absence

11

Management  listed on an annual basis during years 2007 - current inclusive.

Defendant's Answer: See Objection to Interrogatory No. 2.

Plaintiff's Response: See Plaintiff's Response for Interrogatory No. 2 as well as the facts that the

Matrix Absence Management website (www.matrixcos.com)(Exhibit 5) states that Matrix

partners with employers to provide customized management of disability coverage.  Its services

are designed to "improve bottom-line financial results" in disability management.  It goes on to

state that its affiliation with insurance products allows its clients a "variety of program funding

mechanisms...consistent with the client's business objectives."  Their expressed goal is to reduce

productivity losses when employees are out of work and to decrease benefit cost.  Matrix

represents only large corporate or institutional interests.  The company uses an "automated

duration review system" using "nationally recognized guidelines" as a benchmark for identifying

claims for intervention.  If necessary, independent medical consultants are used to "ensure your

ill or injured employee's recovery is progressing to a healthy return."  For this reason, it

behooves Reliance Standard to refer a vast number of claims to Matrix for these cost control

(read, "claims control") purposes.  Such a rate of referral is clearly relevant.

**Interrogatory No. 4:** Provide the total number of disability claims referred (either directly or

through any intermediary) to National Medical Evaluation Services(A subsidiary of the MLS

Group of Companies, Inc.) for the performance of medical records and/or peer review during the

years 2007 - present inclusive listed on an annual basis.  Further state for each year listed in the

response how many of the stated cases found a claimant suffering from restrictions or limitations

and/or unable to work.

Defendant's Answer:   Defendant objects to plaintiff's interrogatory on the grounds that is it

overly broad in time and scope and not reasonably calculated to lead to the discovery of admissible evidence.  In addition, defendant objects on the grounds that the request is unduly burdensome as defendant does not maintain the information sought regarding claims referred to National Medical Evaluation Services and it would require a manual review of each claim file to obtain such information.

Plaintiff's Response: There has been considerable evidence discovered previously concerning the MLS Companies[1] including the deposition of Robert Weiner, MD, in *Cleveland v. Liberty Life Assurance Company of Boston*, No. 2:06-CV-13780 in the United States District Court of Michigan dated 11/14/07 contained statements including:

- He has been deposed more than 200 times (P4, L17 - 21)

- One-third of his work involves litigation related opinions (P5, L13 - 16)

- He prepares approximately 15 reports for Liberty Life Assurance Company in the year 2006 (P6, L14 - 17), with a total of 70 - 80 in the past five year period (P7, L13 - 16)

- He prepares reports for other services such as MLS medical (P8, L2 - 5)

Dianne Zwicke, MD, in her deposition in *Cleveland v. Liberty Life Assurance Company of Boston*, No. 2:06-CV-13780 in the United States District Court of Michigan dated 11/14/07 testified to the following:

- She has been deposed 40 - 50 times (P4, L2 - 8)

- She spends 2 - 15 hours each week preparing legal medical opinions (P5, L 23 - P6, L1)

- She had prepared two reports each week for MLS in the current year (P6, L12 - 16) with a total of approximately 100 for the year with volume increasing each

---

[1]MLS information attached hereto as Exhibit 6)

year

- She only retains the documentation for the medical review for 24 hours unless instructed to keep it longer (P9, L4 - 7)

- She had been paid $31,433.25 in the year 2005 by MLS (P10, L4 - 8)
- She estimated that she found that claimant could not work in only 10 - 20% of cases reviewed (P21, L18 - 25)

The Declaration of Laurence Padway in *White v. Coblentz, Patch, Duffy and Bass, LLP Long Term Disability Insurance Plan*, Case No. 10-1855 (BZ) in the United States District Court for the Northern District of California dated 3/30/11 stated that the Prudential Insurance Company of America is responsible for a large amount of work referred to MLS.  Prudential paid MLS $1,818,725 in 2007,  $1,905,709 in 2008 and $1,234,063 in 2009.   Prudential Insurance Company of America is also responsible for a large amount of work referred to MLS.  Prudential paid MLS $1,818,725 in 2007,  $1,905,709 in 2008 and $1,234,063 in 2009 (actual documents marked as confidential).

MLS' hypocrisy was exposed in *Lavino v. Metropolitan Life Ins. Co.*, 2011 WL 198452 (C.D.Cal. 1/20/11) in which this company described the debilitating nature of fibromyalgia in its own website article, but went on to issue an unfavorable medical review discounting the condition.

Given these facts, the quality and credibility of the work performed by MLS (including National Medical Evaluation Services) is questionable as it is influenced by the monies paid by the insurance industry which desires medical reviews which may be utilized for the denial of claims.  Therefore, the number of claims referred, number of claims finding the person not able to perform work activities ("disabled") as opposed to those that do not, and the monies paid on a yearly basis are all relevant to this inquiry.

14

The medical community and media have expressed suspicion concerning the medical review industry[2].

*Inherent Conflict of Interest:*

A cadre of physicians have chosen to make a living by assessing disability and impairment for labor unions, employers, government agencies, and attorneys.  Many of these physicians have no specialized training in or out of medicine to prepare them for such duties.  Others have chosen to retire from clinical practice and should not be expected to possess unique skills for the assessment of either impairment or disability.  Such people carry the title of MD but make decisions about moral desert more appropriately made by lawyers and priests.  Physicians should focus on diagnosis leading to treatment, not diagnosis leading to social welfare benefits.  Loeser, JD and Sullivan, M.  Disability in the chronic low back pain patient may be  *Pain Forum*.  1995; 4(2): 114 - 21.

There is no closer scrutiny of IME advocates claim to superior objectivity.  Insurance carriers and employers have an interest in limiting and predicting liability.  These perennial interest have become more acute with increasing competition and lean production.  This business climate has created expanded business opportunities for physicians and entrepreneurs selling IME services to insurance companies.  IMEs are generally neither objective nor of superior quality.  Although called "independent," the examiners are dependent on their corporate clients for their livelihood.  Changes brought on by reform allow employers to choose the IME companies and the companies to choose the physicians providing the services.  This has resulted in a captive audience of worker/patients sent t these providers with cost reduction as the measure

---

[2]Documentation attached hereto as Exhibit No. 7.

of measuring success.  The irony in this context is that the employer/insurer or examining

physician is concerned with the worker/patient's well-being.  The selling of services to

corporations and depending on those corporate clients for financial survival and enrichment

results in an unequal balance of power which guarantees the IMEs will serve corporate interests.

IMEs will remain in demand as long as employers and insurance carriers find them to be

dependable aids to cost-cutting.  Dependability goes hand in hand with predictability.  Lax, M.

Independent of what?  The independent medical examination business. *New Solutions*.  2004;

14(3): 219 - 51.

IMEs justify their argument by stating that workers in general are untrustworthy when

reporting how an illness impacts their activities whether for conscious (fraudulent) or

unconscious (psychological) reasons.  For these reasons, workers will seek validation for their

conditions to maintain various gains with workers disliking their job situation refusing to return

to work.  Aiding these untrustworthy workers are physicians who consciously perpetrate fraud

out of economic self-interest.  The IME advocates also argue that the treating physicians are

unskilled in disability assessment.   To this end, the IME will probe for any holes in the patient's

account and characterize the claim as "unjustified."  *Id.*

Injured workers face terrible insecurity as to file a claim will result in their facing a long

and difficulty process.  Employers generally will not provide accommodated work and will

threaten termination for the workers' failure to perform his usual work.  This leads to an

exceedingly common course of injured workers ignoring or minimizing their injuries or illness

and to struggle to continue working beyond any reasonable limits.  Despite increased attention,

the IMEs charge of widespread work fraud has never been proven by any amassed evidence.

16

Studies prove that workers faking injury/illness is a minuscule problem.  This does not stop the

repetitive assertion of a massive fraud problem with prominent publicity given to anti-fraud

efforts which yield next to nothing in terms of finding more than a handful of workers behaving

illegally.  On the other hand, physicians in busy practices do not have the time or energy to

devote to doing paperwork, demands for information, and justification of their patient care.

Whereas, IMEs assert and emphasize psychosocial components to criticize a patient's failure to

return to work due to illness or injury.  This places the burden of responsibility increasingly to

the patients who must persevere against the charge that their illness has more to do with

"motivation and not impairment."  To support the IMEs, the physicians will minimize subjective

elements such as pain and question the validity of patient assisted evaluation of neurological

testing such as sensation, motor function, gait, and balance.  Such conduct is best illustrated by a

study in which 27 IMEs were performed on patients with all but one examination not taking the

position that benefits to the worker should be reduced. The IME will oppose disability claims by

claiming workers' activities of daily living (ADLs) clearly demonstrate their ability to work.

The IME version of disability assessment focuses on disease rather than illness although the

same illness will be experienced quite differently by different individuals. Overall, the IMEs

possess a "worldview" that worker/patients are dishonest and will label these persons as

"malingerers," "symptom magnifiers," or of seeking secondary gain.  To promote their efforts,

IME advocates are engaged in an ongoing effort to legitimize their practice within their selected

target groups by creating credentialing processes.  In turn, this enhances profitability again to

those offering the necessary course work to gain requisite credentials. *Id.*

There have been significant conflicts of interest noted in the occupational health

profession.  This most prevalent noted is pressure from insurance companies which influence these practitioners to make findings against the interest of workers due to the large financial interests at stake.  Very few of these practitioners are willing to offer expert witness testimony on behalf of workers concerning their claims.  This is so pervasive that: "For every occupational physician willing to take a position on a controversial issue, there are many more that eager to accept corporate payment to debate this issue, to appear in court on behalf of employers, to conduct self-serving scientific investigations and the publication of industry-friendly papers, or to make biased interpretations of other investigators."  The most lucrative opportunities for this group is providing "expert witness" testimony in environmental lawsuits.  Unfortunately the Code of Ethics for ACOEM is vague and unenforceable with provisions for unethical behavior removed in 1993.  ACOEM's *Journal of Occupational and Environmental Medicine* (*JOEM*) is "decidedly pro-industry" in its editorial policy and publications.  This journal has demonstrated a lack of scientific objectivity as it does not eschew corporate interests as it should.   There is also criticism leveled at this publication due to its marginal peer review policies.  Such policies led to a retraction of a 1997 article which was found to be fraudulent.  Ladou, J.  American College of Occupational and Environmental Medicine (ACOEM): A professional association in service to industry.  *Int J Environ Health*.  2007; 13: 404- 26.

Independent medical evaluators unlike a treating physician is not obligated to have the patient as a primary interest.  However, their opinion and testimony should be held to the same scientific and ethical standards.  The monies earned from medico-legal work are far greater than the reimbursement received for office-based patient care and virtually all non-interventional treatments.  The linkage of expert testimony with current and financial gain is an inherent and

powerful conflict of interest which has significant potential to bias.  Given the benefits of a

medical-legal practice, it is no wonder that experts want to be hired again.  It is obvious that an

IME or expert witness offers too many opinions that are not in the interest of the contracting

party, that physician might not be hired again.  Therefore, physicians devoting the majority of

their practice to performing medical-legal evaluations has the greatest potential for bias.  In this

context, the doctor "knows who is paying the bill." Far more IME's are ordered by insurance

carriers and defense attorneys than by claimants and plaintiff attorneys.  Over a period of time,

the IME physician develops a certain reputation based on his or her track record.  These experts

have in a sense already settled on their position before weighing the facts and science of the case.

Schofferman, J.  Opinions and testimony of expert witnesses and independent medical

evaluators. *Pain Med*. 2007;  8(4): 376 -82.

It has been warned that a consultative physician should not cross into the role in which

the best outcomes for groups of patients (or society as a whole) is sought as this might lead to a

loss of credibility for physicians for the care of individual patients.  Carey, TS.  How successful

are we in determining disability?  *Neurol Clin N. Am*.  February, 1999; 17(1): 167 - 77.

Qualifications for an expert witness include holding a valid license to practice medicine;

board certification (or board eligibility); specialized training, knowledge or certification; should

be able to demonstrate relevant continuing medical education appropriate to the issues in the

case; should be in active practice of clinical medicine; and if more than 20% of the physician's

practice is medical-legal work, then the physician should be prepared to provide an opinion tha

tis not biased by financial considerations.   Testimony and reports should be impartial, unbiased,

and based on current scientific evidence.  Testimony and reports should state a basis for the

opinions expressed whether they are based on personal experience, medical references, evidence-based guidelines or generally accepted opinions in the speciality. *Id.*

Some experts may be overly invested in the medicolegal community and will have their objectivity compromised, or at least have the appearance of such. Experts who derive more than half of their income from medicolegal evaluations are probably too invested in forensic practice. A danger in this is the examiner's fear that the cannot continue to obtain lucrative compensation unless they offer opinions consistent with the views of who has hired them. Such dependent relationships are slanted towards a biased outcome. Such examiners have an unequal weight of referrals from either the defense or plaintiff side, and, in extreme cases may completely exclude one side totally. A survey of psychology practitioners voiced concerns with such examiners, with some members calling them "whores." No matter what, the influence of economic compensation or the need to please the hiring party may affect the examiner, even if he/she is unaware of it, in terms of objectivity in cases of greater ambiguity in tests results, behavioral observations, or responses on measures of motivation or bias. Martelli, MF, et al. Promoting ethical and objective practice in the medicolegal arena of disability evaluation. *Phys Med Rehabil Clin N Am.* August, 2001; 12(3): 571 - 85.

At times, insurers can become overzealous in their drive to deny claims and will select the physician to accomplish the IME and pay a respectable amount for their bias favoring the carrier. Vasudevan, SV, and Drury, DL. The independent medical examination: Purpose and process. *WMJ.* March/April, 1999: 10 - 12.

*Media Reporting:*

The *New York Times* article on 4/1/09 titled "Exams of Injured Workers Fuel Mutual

Mistrust" detailed the poor conduct of "independent" medical examiners in the New York

Workers Compensation system which consistently found against claimants no matter how

injured they were.  As the interviewed examining physician stated:

> If you did a truly pure report, you'd be out on your ears and the insurers
> wouldn't pay for it. You want to give them what they want, or you're in
> Florida.  That's the game, baby."

This reasoning demonstrates why a review of cases found a routine tilt toward the benefit

insurers by minimizing or dismissing injuries.  This was accompanied by a comment by Dr.

Stephen M. Levin, Co-Director of the Occupational and Environmental Medicine Unit of Mount

Sinai Medical Center that "There are some noble things you can do in medicine.  This ain't one

of them."

Many of the examiners are older, semiretired physicians who no longer treat patients who

can be certified for this type of work easily.  Some examiners see dozens of injured workers each

day.  The best protection is for the worker to videotape the examination as the reports are

transcribed with the physicians failing to review them of many occasions.

*The IME Business Model:*

IME companies have been set up by physicians to offset declines in reimbursement for

medical services.  Payment for IMEs falls outside the realm of traditional third-party

reimbursement and are not subject to external controls (i.e., managed care).  This provides a

timely and logical opportunity to generate additional revenue and can offset any potential loss of

clinical services income.  Marketing of the IME to insurance companies through existing

insurance contacts is encouraged.  The stereotype of a physician-reviewer who is an opportunist

who is nearing the end of his or her medical career is not without basis in reality.  These

"bought" opinions are becoming more transparent to judges and juries and decrease the motivation for seeking a predetermined opinion.  Hamilton, M.  Setting up an in-office independent examination company.  *Clin Sports Med*.  2002; 21: 289 - 303.

One of the vexing issued for the IME industry is its questionable relationship with insurers.  It has long been questioned how IME facilities can guarantee an impartial examination when the insurer is paying the bill when the insurer is seeking to minimize its exposure and can take their business elsewhere.  The IME industry have very little barrier to entry.  Where the business field is crowded, an IMR company may need to be more aggressive with its marketing efforts.  Quality assurance with use of nurse case consultants who job is "pushing the physicians to produce thorough and well-reasoned reports" and assist in "meeting the medicolegal challenges."  Rozman, S.  Medical opinions: The physician-owned independent medical examination company.  *Orthop Clin N Am*.  2008; 39: 81 - 7.

Economic factors may also create pressures to identify new sources of income with litigation representing one of the last unregulated frontiers.  Martelli, MF, et al.  Promoting ethical and objective practice in the medicolegal arena of disability evaluation.  *Phys Med Rehabil Clin N Am*.  August, 2001; 12(3): 571 - 85.

Charges for an IME should be fixed, based on the time spent in the process and not on different rates for specific activities. Ameis, A and Zasler, ND.  The independent medical examination.  *Phys Med Rehabil Clin N Am*.  2002; 13: 259 - 86.

The obvious incentive for physicians to perform IMEs is a financial one.  IMEs are free of many of the problems associated with managed care and do not involve physician-patient entanglements.  They are not bound by fee restrictions set by health insurers or state-based

compensation systems.  Thus, fees billed are very lucrative.  The paperwork is simplified to a single report. Enterprising physicians and entrepreneurs may enhance their income further by establishing IME companies.  The IME company maintains relationships with physicians with various specialities so an employer needs only to contact the IME company for services.  The money flows from the insurance carrier or employer to the IME company to the examining physician. This allows the IME physician to claim that he/she was not paid directly by the insurance carrier or employer.   Lax, M.  Independent of what?  The independent medical examination business. *New Solutions*.  2004; 14(3): 219 - 51.

This information from both the medical community and media reveals that the medical review industry is rife with bias due to the practice of "payments for denials."  Therefore, the information requested is relevant to the issue of bias of reviewing physicians' credibility.

**Interrogatory No. 5:** Provide the total number of disability claims referred (either directly or through any intermediary) to MES Solutions for the performance of medical records and/or peer review during the years 2007 - present inclusive listed on an annual basis.  Further state for each year listed in the response how many of the stated cases found a claimant suffering from restrictions or limitations and/or unable to work.

Also see the explanation of medical review company conflicts as summarized in Interrogatory No. 4 above and Exhibit 7.

Defendant's Answer: Defendant objects to plaintiff's interrogatory on the grounds that it is overly broad in time and scope and not reasonably calculated to lead to the discovery of admissible evidence.  In addition, defendant objects on the grounds that the request is unduly burdensome as defendant does not maintain the information sought regarding claims referred to

MES Solutions and it would require a manual review of each claim file to obtain such
information.

Plaintiff's Response:

MES Solutions in its promotional website materials (www.messolutions.com)[3] states that
it serves only disability carriers, third party administrators and employers.  It does not provide
services to claimants.  It touts it competitive pricing and makes functional capacity evaluations
available.  MES does not list any physical examination services for its clients.

The deposition of Ghassan Bahnam, M.D. in the case of *Garrison v. Aetna Life Ins. Co.*,
CV 07-3094 JFW in the United States District Court for the Central District of California
resulted in the following statements:

- He was the Senior Vice President of Quality Development for MES Peer Review Services  (P7, L16 - P8, L1)

- MES provides peer review services to insurance companies, hospitals, and the like (P10, L8 - 12)

- There was a written contract between Aetna and MES Peer Review Services in 2006 and 2007 (P12, L1 - 12) as well as 2008 (P16, L1 - 3)
- 
- Rates charge for physician reviews range from $210 - 315 per hour (P18, L17 - P19, L3)

- MES invoiced Aetna for approximately $500,000.00 for the period of 2006 to the date of the deposition

- MES has a contract with Rick Bauer, DO (P32, L2 - 19)

- Aetna made no inquiries concerning Dr. Bauer's background, licensure, practice, or number of paper reviews performed (P36, L23 - P39, L13)

---

[3]All MES promotional materials, deposition excerpts and declarations have been attached
hereto as Exhibit No. 8.

- MES has not performed reviews on behalf of claimants does not market to claimants (P40, L1 - 12)

- Dr. Bauer has performed approximately 1260 reviews for MES over a course of three years (P41, L1 - 15) resulting in billing of over $1M for MES total (P52, L13 - 24) equaling approximately $400K/year in revenue (P53, L2 - 6)

- All expert reports are reviewed by MES nurses who are in charge of "cleaning up" and "correcting" the reports (P49, L1 - 20)

- MES markets to insurance companies including Prudential, Metlife, Cigna and the Hartford (P54, L10 - 13, P60, L2 - 6)

- In 2006, MES produced approximately 50,000 medical reviews for insurers (P60, L15 - 17)

The deposition of Bruce LeForce, MD in *Scheffel v. Standard Life Ins. Co.*, CV 06-00198

in the United States District Court for the Northern District of Illinois, Eastern Division, on

10/10/07, stated the following:

- 25% of his practice was spent doing peer review work in the form of chart reviews without physical examination (P6, L3)

- He works for MES Solutions, Reed (Reliable) Review Services and Med Solutions (P6, L10 - 12)

- He has performed work for MES Solutions since 1995 (P8, L14)

- He has never done work for a plaintiff's attorney (P8, L15 - 16)

- The most he has earned in a year from MES is $50,000.00 (P8, L23)

- He did not ask MES or the insurer from information concerning the stress or intellectual demands involved with the claimant's occupation (P31, L10 - 17)

- He would not have any reason not to believe a claimant's subjective statements concerning side effects of medication (P34, L5 - 8)

The deposition of Bruce R. LeForce, MD dated 10/10/07 in the case of *Scheffel v.*

*Standard Insurance Co.*, Case No. 06-00198 in the U.S.District Court for the Northern District

25

of Illinois, Eastern District, resulted in the following statements:

- 25% of his work is undertaking "peer review work" (P6, L3 - 5)

- He works for several companies including MES Solutions, Reed/Reliable Review Services and Med Solutions (P6, L6 - 12)

- All of his review work is medical reviewing without physical examination (P6, L18 - 21)

- He had been working for MES for approximately 12 years (P7, L12 - 14)

- He has never done work on behalf of a plaintiff (P8, L15 - 17)

- The highest single year compensation he received from MES was $50,000.00 (P8, L18 - 23)

- He once was employed solely by reviewing company Med Solutions for an entire year (2002 - 3) (P9, L3 - 5)

- He is not given occupational information concerning a claimant, but still gives opinions concerning whether a person can perform a certain job (P31, L10 - P32, L8)

- He would not have any reason to not believe a claimant's reported medication side effects (P34, L5 - 8), but would not consider them as evidence of disability (P86, L11 - 14)

It is improper to rely on multiple medical reviews from MES when the insurer had the authority to conduct a physical examination and failed to acquire one. *Williams v. Hartford Life & Accid. Ins. Co.*, 2009 U.S.Dist.LEXIS 94857 (S.D.Ohio 9/25/09).

MES Solutions was acquired by Exam Works, Inc., a company which owns other similar other cost control business including Health Cost Management, Inc, Roy Medical Consultants, Inc., Verity Medical, Inc., among others. Its website (www.examworks.com) states that its services are designed for "cost containment" purposes. It provides independent medical examinations in addition to its peer review services. The Exam Works Form 10-K for the United

26

States Securities and Exchange Commission dated 3/4/11 and states that it provides services to the insurance industry, third party claim administrators and attorneys working on specific claims for insurance carriers.  It does not provide services to claimants.  It goes on to state that IME services are regularly used in disability claims with main focus on cost containment.  This work is a "low-risk revenue source" which is attractive to physicians performing such work.  It continues in stating that the IME industry suffers from inconsistent quality of services.  Its IME business is utilized for the purpose of "liability management process."

The Declaration of Laurence Padway in *White v. Coblentz, Patch, Duffy and Bass, LLP Long Term Disability Insurance Plan*, Case No. 10-1855 (BZ) in the United States District Court for the Northern District of California dated 3/30/11 stated that the Prudential Insurance Company of America is responsible for a large amount of work referred to MES.  Prudential paid MES $369,031 in 2008 and $400,992 in 2009 (actual documents marked as confidential).

This information clearly establishes that MES is a insurance industry driven business which utilizes the same roster of physicians over and over again for the purpose of churning medical reviews for its insurer clients.  The large sums of money being paid to MES clearly render it subject to bias in order to maintain its income flow from insurers in return to favorable medical reviews which state that claimants are capable of work activity.

The Defendant's bookkeeping includes all bills paid to MES for the purpose of each review billed.  This information can be quickly correlated to find the pertinent medical reviews for the purpose of discovery.

**Interrogatory No. 6:**   With respect to the total number of disability claims identified in the answer to Interrogatory No. 5 above, provide a total of all monies paid to MES Solutions listed

27

on an annual basis during years 2007 - current inclusive.

Defendant's Answer: See Objection to Interrogatory No. 5.

Plaintiff's Response: See Response to Defendant's Objections to Interrogatory No. 5.

**Interrogatory No. 7:** Provide the total number of disability claims referred (either directly or through any intermediary) to Dr. Francisco Ward for the performance of medical records and/or peer review during the years 2007 - present inclusive listed on an annual basis.  Further state for each year listed in the response how many of the stated cases found a claimant suffering from restrictions or limitations and/or unable to work.

Defendant's Response: Defendant object to plaintiff's interrogatory on the grounds that it is overly broad in time and scope and not reasonably calculated to lead to the discovery of admissible evidence.  Without waiver, defendant did not refer any claims to Dr. Ward directly. Upon information and belief, in addition to the report in this claim, Dr. Ward has provided Reliance Standard with one other opinion.

Plaintiff's Response: For the time and effort expended on its objection, the Defendant could easily have produced the other report from Dr. Ward (which it had to locate to make its objection) and stated the amount paid and the result of the findings. Instead, the Defendant has chosen the position of maximum resistance as is its customary behavior.

**Interrogatory No. 8: Waived.**

**Interrogatory No. 9:**  Provide the total number of disability claims referred (either directly or through any intermediary) to Crowe, Paradis & Albren for Social Security disability benefits representation during the years 2007 - present inclusive listed on an annual basis.

Defendant's Answer:   Defendant objects to plaintiff's interrogatory on the grounds that it is

overly broad in time and scope and not reasonably calculated to lead to discovery of admissible

evidence.  In addition, defendant objects on the grounds that the request is unduly burdensome as

defendant does not maintain the information sought regarding the number of claims referred to

Crowe, Paradis & Albren and it would require a manual review of each claim to obtain such

information.

Plaintiff's Response: The Defendant is not being honest with Plaintiff or this Court.  The

Defendant has a contractual relationship with Crowe, Paradis & Albren (now called "The

Advocator Group") to provide Social Security Disability representation to claimants.  As part of

this representation, the hired firm is responsible for collecting overpayments (duplicative

payments from back monies paid by SSA to be deducted from short/long term disability fees

previously paid) from claimants.  The Defendant carefully tracks this information as part of its

claim reimbursement program.  Defendant's statements to the contrary are baseless.

As Defendant's relied upon their hired law vendor to provide representation for this case

in return for gaining a offset reimbursement, the frequency of this practice sheds light on the

credibility of their denial as the Defendant has taken an openly contradictory stance as to

whether the Plaintiff and other claimants are disabled depending solely on its financial interest.

This practice alone constitutes an overt conflict of interest.

**Interrogatory No. 10:**  Provide the total number of disability claims referred (either directly or

through any intermediary) to First Advantage Investigative Services for the performance of

claimant investigations during the years 2007 - present inclusive listed on an annual basis in

addition to all sums paid listed for each year 2007 - present.

Defendant's Answer:   Defendant objects to plaintiff's interrogatory on the grounds that it is

overly broad in time and scope and not reasonably calculated to lead to discovery of admissible

evidence. In addition, defendant objects on the grounds that the request is unduly burdensome as

defendant does not maintain the information sought regarding the claims referred to First

Advantage Investigative Services and it would require a manual review of each claim file to

obtain such information.

Plaintiff's Response:

    First Advantage Investigative Services who was paid $1,422.72 for its work [4].  First

Advantage's website  (www.fadv.com) offers its services only to companies and not individuals.

It is owned by CoreLogic (www.corelogic.com) which also only works for corporations and is a

leader in "business intelligence."

    The Defendant have a contract with this investigation service.  To receive more business

from Defendant, the investigator may color its findings to suit the needs of the Defendant to

assist in denying claims.  As expressed in its website, First Advantage openly advertises for this

express purpose.  Therefore, this information is relevant to the conflict of interest question.

**Interrogatory No. 11:**  Please identify any and all internal guidelines, policies, procedures,

claims handling manuals, training manuals, internal documents, memorandum, and policy and/or

procedure statements in existence during the time this claim was considered, either on initial

application or on further appeal(s), concerning the interpretation and/or administration of the

policy issued in this case that are not contained in the claim  record whether relied upon or not

during the administration of the subject disability claim.  Identify all reasons for why or why not

each applicable guideline, policy or procedure was or was not followed in review of the subject

---

[4]First Advantage documentation attached hereto as Exhibit No. 7.

claim.  Please identify a corporate designee or designees who can testify as to all polices and procedures utilized in evaluating and deciding disability claims and reasons for why or why not such policies, procedures guidelines were or were not followed in the review of the subject claim.

Defendant's Answer: A copy of the internal guidelines was previously produced to plaintiff while the claim was pending.  Defendant objects to plaintiff's interrogatory on the grounds that it is overly broad in time and scope and not reasonably calculated to lead to discovery of admissible evidence. Defendant further objects to Plaintiff's suggestion in this interrogatory that he is entitled to conduct a deposition.

Plaintiff's Response:   Management philosophies are expressed in the Matrix Absence Management website (www.matrixcos.com).  This site states that Matrix partners with employers to provide customized management of disability coverage.  Its services are designed to "improve bottom-line financial results" in disability management.  It goes on to state that its affiliation with insurance products allows its clients a "variety of program funding mechanisms...consistent with the client's business objectives."  Their expressed goal is to reduce productivity losses when employees are out of work and to decrease benefit cost.  Matrix represents only large corporate or institutional interests.  The company uses an "automated duration review system" using "nationally recognized guidelines" as a benchmark for identifying claims for intervention.  If necessary, independent medical consultants are used to "ensure your ill or injured employee's recovery is progressing to a healthy return."[5]  This information points to use of disability duration guidelines which were not produced by the Defendant who, as was

---

[5]This information has been produced as part of Exhibit No. 5.

acknowledged in the Answer to Interrogatory No. 1, had final authority over its subsidiary,

Matrix Absence Management, Inc., and can make these disability duration guidelines available.

The "internal guidelines" produced by the Defendants were extremely limited in scope and failed to set forth any detailed claims procedures including such items as medical review techniques and use of surveillance.  For this reason, the Plaintiff has requested all training manuals, policies and procedures, memos, etc. utilized in review of the subject claim.  As indicated in the Answer, such materials exist and are not being produced.  As to designation of a corporate designee, such request is appropriate in accordance with the case law cited as part of Plaintiff's argument.

The failure to follow internal guidelines has been held as evidence of conflict of interest for which the heightened scrutiny of the plan administrator's claims denial has been applied. *Doe v. MAMSI Life and Health Ins. Co.*, 471 F.Supp.2d 139, 148 (D.D.C. 2007); *Pulliam v. Continental Cas. Co.*, 2003 WL 1085939 (D.D.C. Jan. 24, 2003) citing *Friedrich v. Intel Corp.*, 181 F.3d 1105, 1110 (9th Cir. 1999); *Hensley v. Northwest Permanent Retirement Plan & Trust*, 5F.Supp.2d 887, 890 - 2 (D.Or. 1998); *See Also*, *Woodward v. Reliance Standard Life Ins. Co.*, 2003 U.S.Dist. LEXIS 19206 (N.D. Fla. March 11, 2003) citing *Cerrito v. Liberty Life Assur. of Boston*, 209 F.R.D. 663, 664 (M.D. Fla. 2002); *Caldwell v. Life Ins. Co. of Am.*, 165 F.R.D. 633 (D.Kan. 1996); *Blau v. Del Monte Corp.*, 748 F.2d 148 (9th Cir. 1985).

The Defendants seeking to withhold the actual guidelines is no more than a ruse.  It is of great importance to any consumer to be able to understand how his/her claim will be evaluated, whether the evaluation techniques used are fair, and whether an insurer followed these protocols.

Insurance companies typically keep training manuals either on intranet or at work stations.  In any case, claims instructions are readily available and do not involve any great expense or effort to procure.  The simple fact that medical reviews were ordered from a vendor, but there is no mention of use of such reviews in the "guidelines" produced by Defendant makes it clear that there are other sets of instructions which guide claims personnel in their claim review activities.

In this instance, the Defendant has argued out of both sides of its mouth.  It has only produced a short version of a purported claim manual which is clearly deficient.  It tacitly admits in its objection that there are other materials available which it refuses to produce.  These training and claims handling materials are routinely made available to its employees so this information can be readily accessed without any undue burden.  The relevance of this material is unquestionable as the instructions under which claims are administered serve as the linchpin in revealing conflict of interest.

Should Defendant maintain its contradictory stance, Plaintiff requests the right to take the deposition of a claims representative to resolve any questions concerning training and/or claims handling instructions.

**Interrogatory No. 12:**  Identify all employees, agents or officers of the Defendant who were involved in any manner with the Plaintiff's claim for benefits not identified previously in prior interrogatories and set forth their compensation structure including  if any pay was in the form of bonuses, incentives, corporate stock/stock options or other additional pay, please state the amount of such additional payment and state the specific criteria on which such payment was made.

<u>Defendant's Answer:</u> Defendant objects to this interrogatory on the grounds that it seeks

confidential information.  Without waiving this objection, those employees who were involved

in plaintiff's claim are identified in the claim file that was produced to plaintiff.  These

individuals receive a salary with no incentive or bonuses.

Plaintiff's Response:   The Plaintiff is only seeking information concerning all forms of

compensation paid to the claims review personnel employed by the Defendants in this case.

Compensation information requested is not limited to bonuses, but also includes merit pay

increases, issuance of stock and/or stock portions, or any other form of compensation paid.

Understanding how compensation is paid to claims review personnel is extremely important.

Some insurers (most notably, the largest disability insurer, Unum) set performance goals

for claims personnel based partially on corporate earnings in order to pay bonuses and

stock/stock options.  Therein lies the problem. Insurance companies receive premiums and pay

claims.  Claims departments do not have any ability to increase corporate income.  The claims

department can only limit corporate losses.  Therefore, the only possible corporate goal setting

would be to fashion incentives to limit the payment of claims.  The extent to which corporate

objectives influence claims practices remains unknown and is relevant for discovery.

Delphi Financial Group includes several subsidiaries including Reliance Standard Life

Insurance Company, Matrix Absence Management, Inc., and Safety National Casualty

Corporation.  Management philosophies are expressed in the Matrix Absence Management

website (www.matrixcos.com).  This site states that Matrix partners with employers to provide

customized management of disability coverage.  Its services are designed to "improve bottom-

line financial results" in disability management.  It goes on to state that its affiliation with

insurance products allows its clients a "variety of program funding mechanisms...consistent with

the client's business objectives."  Their expressed goal is to reduce productivity losses when

employees are out of work and to decrease benefit cost.  Matrix represents only large corporate

or institutional interests.  The company uses an "automated duration review system" using

"nationally recognized guidelines" as a benchmark for identifying claims for intervention.  If

necessary, independent medical consultants are used to "ensure your ill or injured employee's

recovery is progressing to a healthy return."

Delphi Financial Group's (DFG) stock price has undergone a collapse, falling from a

high of 40.59 in late 2007 to 18.26 in mid-2008.  The 2008 fourth quarter loss was attributed to

investment losses with the company posting a $1.5M loss compared to a $41.7M profit the

previous year.  As of December, 2008, a negative outlook for the stock was issued with a

downgrading of Delphi's credit.[6]

Given the economic problems suffered by Defendant Reliable Standard, there is the clear

potential for creating profits from its disability claims operations which serves as another ground

of relevance for discovery of the employee compensation sought.

**Interrogatory No. 13:**  Provide the total number of disability claims referred (either directly or

through any intermediary) to David E. Lembech, M.Ed., LPC, CRC, CDMS for the performance

of employability analyses during the years 2007 - present inclusive listed on an annual basis.

Please also state for each such year how many such employability analyses resulted in a claimant

being unable to perform work.

<u>Defendant's Answer:</u> Defendant objects to plaintiff's interrogatory on the grounds that it is

---

[6]All corporate entity and earnings information have been attached hereto as part of
Exhibit No. 5)

overly broad in time and scope and not reasonably calculated to lead to the discovery of admissible evidence.  In addition, defendant objects on the grounds that the request is unduly burdensome as defendant does not maintain the information sought regarding claims referred to Mr. Lembech and it would require a manual review of each claim file to obtain such information.

Plaintiff's Response: Again, the Defendant is not being forthcoming.  Mr. Lembech is an employee of the Defendant and his workflow is tracked on a regular basis.  The assignment of cases are logged into the company database and his work may accessed with ease.

Should Defendant maintain its contradictory stance, Plaintiff requests the right to take the deposition of another or same claims representative as requested in the Response to Interrogatory No. 10 to resolve any questions concerning how Mr. Lembech is assigned cases and the tracking of his workload.

The determinations from Mr. Lembech's "employability analyses" will demonstrate that his work is biased toward findings that claimants are able to perform work.  Such work product is clearly indicative of a conflict of interest and is relevant to such an inquiry.

*Requests for Production of Documents*

**Request No. 1:** All contractual agreements, operating instructions, or guidelines evidencing relationship and or control of the corporate entities Reliance Standard Insurance Company and Matrix Absence Management and their parent corporation, Delphi Group.

Defendant's Answer:

Defendant objects to plaintiff's request on the grounds that it is overly broad, vague and not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff's Response: As set forth in Plaintiff's Response to Interrogatory No. 1, the Defendant

36

has stonewalled concerning its relationship with Matrix Absence Management, Inc. even though both companies are subsidiaries of Delphi, Inc.

As referrals to a sister company are hardly an arm's length transaction, the performance of Matrix Absence Management is influenced by the Defendant. Therefore, the exact documented relationship between the entities is relevant for conflict of interest discovery purposes.

**Request No. 2:**  All contractual agreements, operating instructions, or guidelines pursuant to which MLS National Medical Evaluation Services performed any medical records review and/or peer review work during the time period 2007 - current inclusive for Reliance Standard or other parent company or subsidiary.

Defendant's Answer: Defendant objects to plaintiff's request on the grounds that it is overly broad, vague, and not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff's Response: The request is perfectly clear as is the intention with the Defendant's answer being "vague and overly broad."  The contractual terms between MLS National Medical evaluation Services (through its subsidiary National Medical Evaluation Services) is relevant to the issue of conflict of interest as large number of referrals are sent for the purpose of medical review to MLS and its subsidiaries with this income influencing the outcome of medical evaluations.  The terms of the contractual agreement serve as evidence of the conflict of interest in this regard.  For more see Plaintiff's Response to Interrogatory No. 4.

**Request No. 3:**  All contractual agreements, operating instructions, or guidelines pursuant to which MES Solutions performed any medical records review and/or peer review work during the time period 2007 - current inclusive for Reliance Standard or other parent company or

subsidiary.

Defendant's Answer: Defendant objects to plaintiff's request on the grounds that it is overly

broad, vague, and not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff's Response: See Response to Request for Production No. 1 and Interrogatory No. 5.

**Request No. 6:**  All contractual agreements, operating instructions, or guidelines pursuant

to which Crowe, Paradis & Albren was hired to pursue Social Security disability benefits on

behalf of claimants referred to by Reliance Standard.

Defendant's Answer: Defendant objects to plaintiff's request on the grounds that it is overly

broad, vague, and not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff's Response: See Plaintiff's Response to Interrogatory No. 9.

**Request No. 7:** All contractual agreements, operating instructions, or guidelines pursuant to

which First Advantage Investigative Services for the performance of claimant investigations

referred by Reliance Standard.

Defendant's Answer:  Defendant objects to plaintiff's request on the grounds that it is overly

broad, vague, and not reasonably calculated to lead to the discovery of admissible evidence.

Notwithstanding and not waiving the defendant's objections, defendant will produce the

applicable agreement between Reliance Standard and First Advantage Investigative Services to

the extent it exists.

Plaintiff's Response: Defendant has still failed to produce the document as promised.  The

Defendant has failed to produce any operating instructions or guidelines under which First

Advantage Investigative Services was performing work for the Defendant.  This information, in

of itself, may reveal pertinent information of conflict of interest and in accordance in the

38

Plaintiff's Response to Interrogatory No. 10.

**Request No. 8:** Copies of all IRS Form 1099s issued to MLS National Medical Evaluation

Services and/or its parent company MLS Group of Companies, Inc.for 2007 - current inclusive.

Defendant's Answer:  Defendant objects to plaintiff's request on the grounds that it is overly

broad, vague, and not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff's Response: These forms are routinely kept on bookkeeping databases and are readily

accessible.  Defendant has no excuse for readily producing such documentation.  See Plaintiff's

Response to Interrogatory No. Interrogatory No. 4.

**Request No. 10:**   Copies of all IRS Form 1099s issued to First Advantage Investigative

Services for 2007 - current inclusive.

Defendant's Answer:  Defendant objects to plaintiff's request on the grounds that it is overly

broad, vague, and not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff's Response:  These forms are routinely kept on bookkeeping databases and are readily

accessible.  Defendant has no excuse for readily producing such documentation.  See Plaintiff's

Response to Interrogatory No. Interrogatory No. 10.

**Request No. 11:**  Copies of all IRS Form 1099s issued to MES Solutions, Inc. for 2007 -current

inclusive.

Defendant's Answer:  Defendant objects to plaintiff's request on the grounds that it is overly

broad, vague, and not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff's Response:  These forms are routinely kept on bookkeeping databases and are readily

accessible.  Defendant has no excuse for readily producing such documentation.  See Plaintiff's

Response to Interrogatory No. Interrogatory No. 6.

**Request No. 12:**   Any and all educational and/or training materials utilized for the investigation, evaluation, or review of disability insurance claims.  This includes all procedures, manuals, protocols, handbooks, guides, memorandum, intranet materials, policy and/or procedure statements, correspondence, tapes, videotapes, emails and/or other documents that have ever been used or utilized by Defendant that refer or relate in any manner to the following subjects: handling and deciding disability insurance claims, interpretation and/or evaluation of medical records and/or reports, undertaking or interpreting vocational rehabilitation evaluations and/or reports, determination of coverage and/or exclusions, ERISA-based instructions, investigation of disability claims including use of internal resources and/or outside vendors, in addition to all other materials, policies and procedures which in any way relate to handling and/or review of disability claims or dealing with claimants regardless of the title of the document.

<u>Defendant's Answer:</u> Defendant objects to plaintiff's request on the grounds it seeks documents and/or information protected by the attorney by the attorney client privileged or attorney work product doctrine.  Defendant further objects to plaintiff's request on the grounds that it is overly broad, vague, and not reasonably calculated to lead to the discovery of admissible evidence.

<u>Plaintiff's Response:</u> Defendant's objection on the basis of attorney-client privilege is improper. The attorney-client privilege is set forth in Rule 26(b)(3) of the Federal Rules of Civil Procedure. A party asserting this privilege has the burden of establishing that the privilege is applicable.  A party asserting a waiver of the privilege has the burden of establishing the waiver.

A definitive ruling has been made in *Solis v. The Food Employers Labor Relations Association*, 2011 WL 1663597 (4th Cir. 5/4/11).  The *Solis* case clearly holds that the fiduciary exception applies to the the claims of attorney-client privileges and that no good cause showing

is required in the ERISA context.  *Id*. at *8.  This exception clearly applied to attorney-client privilege and the work product doctrine.  These products cannot be withheld from the actual clients, i.e., the trust beneficiaries.  *Id*. at *9.

An ERISA fiduciary cannot assert the attorney-client privilege against a plan beneficiary about legal advice dealing with plan administration. *Coffman v. Metropolitan Life Ins. Co.*, 204 F.R.D. 296, 299 (W.D.Va. 2001); *Gunderson v. Metropolitan Life Ins. Co.*, 2011 U.S.Dist.LEXIS 12394 (D.Utah 2/7/11);  *Wildbur v. ARCO Chemical Co.*, 974 F.2d 631, 645 (5th Cir. 1991),  *Petz v. Ethan Allen*, 113 F.R.D. 494, 497 (D. Conn. 1985), *Washington-Baltimore Newspaper Guild, Local 35 v. Washington Star Co.*, 543 F. Supp. 906, 908-1- (D.D.C. 1982); *Long Island Lighting v. Becher,* 129 F.3d 268 (2nd Cir. 1997).  Specifically, a plan fiduciary has an obligation to provide full and accurate information to the plan fiduciaries regarding administration of the plan.  *Long Island Lighting*, *supra*, at 271-1, citing  *Martin v. Valley National Bank*, 140 F.R.D. 291, 322 (S.D.N.Y. 1991).  An ERISA fiduciary cannot use the attorney-client privilege to narrow the fiduciary obligation of disclosure owed to the plan beneficiaries and must make available to the beneficiary, upon request, any communication with an attorney that are intended to assist in the administration of the plan.  *Id.* citing *Riggs Nat'l Bank v. Zimmer*, 355 A.2d 709, 713-4 (Del.Ch. 1976).  The reasoning behind this principle states that a fiduciary as representative for the beneficiaries of the trust which he is administering is not the real client that is personally being served by counsel when he is seeking advice regarding plan administration.  *United States v. Mett*, 178 F.3d 1058, 1063 (9th Cir. 1999) citing *United States v. Evans*, 796 F.2d 264, 265-6 (9th Cir. 1986);  *Washington Baltimore Newspaper Guild, Local 35 v. Washington Star Co.*, 543 F. Supp. 906, 909 (D.D.C. 1982).  Administrators of an

ERISA plan are fiduciaries acting on behalf of beneficiaries of th plan and are not acting in their capacity as company representatives.  Therefore, the claim handlers cannot be viewed as clients adverse to the claimants.  *In re Lewis v. Unum Corp. Severance Plan*, 203 F.R.D. 615, 620 (D.Kan. 2001).  Predetermination opinions rendered to an ERISA trustee generally fall with in the fiduciary exception and are not protected.  *Ascuncion v. Metropolitan Life Ins. Co.*, 2007 U.S.Dist.LEXIS 46566 (S.D.N.Y. 6/25/06).

The privilege is waived when documents are provided to claims administrators.  *Shields v. UnumProvident Corp.*, 2007 WL764298 (S.D.Ohio March 9, 2007).

This waiver of the attorney-client privilege in the ERISA context  has been upheld in many courts. *Donovan v. Fitzsimmons*, 90 F.R.D. 583, 586 (N.D. Ill. 1981);  *United States v. Evans*, 796 F.2d 264, 265-6 (9th Cir. 1986);  *Helt v. Metropolitan Dist. Comm'n.*, 113 F.R.D. 7, 9-11 (D.Conn. 1986);  *Johnston v. Dillard Dept. Store, Inc.*, 152 F.R.D. 89, 93-4 (E.D. La. 1993);  *Aull v. Cavalcade Pension Plan*, 185 F.R.D. 618 (U.S.Dist. Ct. Co. 1998);  *In re Grand Jury Proceedings Grand Jury No. 97-11-8*, 162 F.3d 554, 556-7 (9th Cir. 1999);  *United States v. Metts*, 178 F.3d 1058, 1063 (9th Cir. 1999);  *Geissal v. Moore Medical Corp.*, 192 F.R.D. 620, 624 (E.D. Mo. 2000);  *Fischel v. Equitable Life Assurance*, 191 F.R.D. 606, 607-8 (N.D. Cal. 2000).

Under ERISA, an employer may only invoke the attorney-client privilege where the employer performs non-fiduciary functions such as termination, amendment or design of the plan.  *Long Island Lighting*, *supra*, at 271 citing *Siskind v. Sperry Retirement Program*, 47 F.3d 498, 505 (2d Cir. 1995); *Izzarelli v. Rexene Prods. Co.*, 24 F.3d 1506, 1524-25 & n.33 (5th Cir. 1994); *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1115, 1161 (3d Cir. 1990);   *Aull v.*

*Cavalcade Pension Plan*, 185 F.R.D. 618 (U.S.Dist. Ct. Co. 1998) citing *Everett v. USAir Group, Inc.*, 165 F.R.D. 1, 4 (D.D.C. 1995).

The attorney-client privilege is lost if the client discloses the substance of an otherwise privileged communication to a third party. *Lewis v. Unum Corp. Severance Plan*, 20001 U.S. Dist. Lexis 5660, (Kansas 2001) citing *United States v. Ryan*, 903 F.2d 731, 741 N.13 (10thCir.), *cert. denied*, 498 U.S. 855, 112 L.Ed. 2d 118, 111 S.Ct. 152 (1990) citing *United States v. Bump*, 605 F.2d 548 (10th Cir. 1979); *United States v. Jones*, 696 F.2d 1069 (4th Cir. 1982). "The confidentiality of communications covered by the privilege must jealously guarded by the holder of the privilege lest it be waived." *Lewis v. Unum Corp. Severance Plan*, 20001 U.S. Dist. Lexis 5660, (Kansas 2001) citing *United States v. Ryans*, 903 F.2d 731, 741 n.13 (10th Cir. 1990)   The disclosure of the substance of the conversations with the legal department of American Home Products as set forth in Exhibit No. 2 results the loss of the any claimed privilege.

Courts have even allowed piercing of the attorney-client privilege when a party is relying upon the advice of counsel of defense to the action. *Clark v. United States*, 289 U.S. 1, 15, 53 S.Ct. 465, 469, 470, 77 L.Ed. 993 (1933);  *United States v. Bilezarian*, 926 F.2d 1285, 1292 (2nd Cir. 1991), *cert. denied*, 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed. 39 (1991); *Vicinanzo v. Brunschwig & Fils, Inc.*, 739 F. Supp. 891, 893 (S.D. N.Y. 1990); *Anderson v. Nixon*, 444 F. Supp. 1195, 1200 (D.D.C. 1978) (client waives attorney-client privilege when he brings suit or raises affirmative defense that makes his intent and knowlege of the law relevant); *Government Fund of Republic of Finland v. Hyatt Corp.*, 177 F.R.D. 336, 343 (D.V.I.1997)(Found that Hyatt's attempt to use attorney-client privilege as both a shield and a sword was part and parcel of its overall scheme to stonewall discovery and obstruct the processes of the court); *In re Pfhol*

*Bros. Landfill Litigation*, 175 F.R.D. 13, 24 (W.D. N.Y. 1997) (No party to litigation may invoke the attorney-client privilege where "to do so would in effect enable them to use as a sword the protection which the Legislature awarded them as a shield."); *Computer Network Corp. v. Spohler*, 95 F.R.D. 500, 502 (D.D.C. 1982); *Glenmede Trust Co. v. Thompson*, 56 F.3d 476, 486 (3d Cir. 1995) (party asserting privilege not entitled to define parameters of waiver by selectively identifying the matter advice actually relied upon).  In general, entries in a claims diary before the insurer denied the claim were not protected work product.  *Evans v. United States Automobile Association*, 541 S.E.2d 782 (N.C. App. 2001).

Plaintiff's Response to Interrogatory No. 12 sets forth the grounds on which Defendant was required to respond to Plaintiff's initial response for this information at the outset of the administrative appeal process.

Defendants are operating under the guise of ERISA.   The work product doctrine has been defined as follows:

> The court looks to the primary motivating purpose behind the creation of the document to determine whether it constitutes work product.  Materials assembled in the ordinary course of business or for other non-litigation purposes are not protected by the work product doctrine.  **The inchoate possibility, or even the likely chance of litigation, does not give rise to work product.  To justify work product protection, the treat of litigation must be "real and imminent."**  To determine the applicability of the work product doctrine, the court generally needs more than mere assertions by the party resisting discovery that documents or other tangible items were created in anticipation of litigation.  *Lewis v. Unum Corp. Severance Plan*, 20001 U.S. Dist. Lexis 5660 (Kansas 2001)(emphasis added)

While litigation can result from any fiduciary act, the Plan Administrator's acts of security legal advice for the plan, and the advice rendered, prior to the plan's decision regarding benefits cannot be said to be anticipation of litigation.  *Lewis v. Unum Corp. Severance Plan*,

20001 U.S. Dist. Lexis 5660 (Kansas 2001) citing *Geissal v. Moore Medical Corp.*, 192 F.R.D.

620, 625 (E.D. Mo. 2000).  The fact that litigation later resulted does not change the ordinary

business nature of the attorney's legal advice into advice rendered in the anticipation of

litigation.  *Id.* citing *Garfinkle v. Arcata Nat'l Corp.*, 64 F.R.D. 688, 690 (S.D.N.Y. 1974).

Consequently, under this reasoning, the *Lewis* court permitted discovery of all pre-decisional

advice and opinions of counsel.

        For these reasons, Defendant's objection is improper and cannot be allowed.

**Request No. 13:**   Any and all correspondence (hard copy or e-mail) to any in-house personnel,

outside consultants, attorneys, medical reviewers, or any other individual involved in reviewing

the subject disability case which  prior to initiation of litigation in this matter

Defendant's Answer:  Defendant objects to plaintiff's request on the grounds it seeks documents

and/or information protected by the attorney by the attorney client privileged or attorney work

product doctrine.  Defendant further objects to plaintiff's request on the grounds that it is overly

broad, vague, and not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff's Response: Defendant is not entitled to attorney client privilege or work product

protection as set forth in the Response to Request No. 12.

**Request No. 15:** Please provide any disability duration management documents or any similar

documents or database materials relating to Plaintiff's claim and all documents that discuss,

reference, or explain the meaning, purpose and use of such documents in managing claims.

Defendant's Answer: Defendant objects to plaintiff's request on the grounds that they are overly

broad, vague, and not reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff's Response: Matrix Absence Management, Inc. touts its use of disability duration

45

management guidelines in its promotional literature (contained in Exhibit No. 5).

Disability guidelines cannot be blindly accepted or considered inviolate. If that were the case, they would cease to be guidelines and would become "standards" or even "mandates." Guidelines and their application must be directed primarily to the well-being of the patient. Guidelines must be based on appropriate data and research. The should reflect outcomes, and should be constantly monitored, evaluated, and updated. The purpose of "guidelines" are to serve as "guides" in promoting education of health care providers in the interest of high-quality patient care. Punitive or disciplinary emphasis is counterproductive. Guidelines cannot encompass every diagnosis or treatment of all disease states, nor can the include all variations that occur in the complexity of the human response which includes comorbid conditions. Where clear discrepancies exist, the physicians is responsible for guiding the individual patient's course leading to diagnosis and treatment. The guidelines should be flexible to permit variations in patient condition including severity of illness and comorbid conditions. Guidelines should be formulated "locally" so as to account for health care providers knowledge and standard of care. Guidelines that serve to restrict patient care for reasons other than the patient's well-being are not acceptable. Guidelines that are formulated through a rigorous process should be followed in good faith with patterns of exceptions due to variations in patient condition utilized to refine the guidelines. *Bulletin of the American College of Surgeons*. March, 1998; 83(3).

Poor use of the guidelines takes place when guidelines user wait until an "at risk" date to take some action. These guidelines can create a false sense of security due to a cycle of inaction. It is more worthwhile to use the guideline as an initial prediction of disability duration or, as characterized, "today's best guess." Some organizations will utilize the guidelines as a tripwire

46

to trigger increased effort or other activities.  Others will use the guideline as a "goal to beat."

Respected, evidence-based guidelines carry much more weight than arbitrary or confidential

ones.  Estimating disability duration for the purpose of reserves is a conservative business.

Although it is"not good form to revise reserves, especially upwards."  Case managers taking

risks to lower the disability duration should be rewarded.   Those who consistently achieve goals

deserve extra recognition.  Christian, J.  President of Webility.md (2005).

There are several complications resulting from use of disability duration guidelines.

Guidelines based on "actual data" reveal that prolonged disability is very common.  There tends

to be a mismatch for disability durations shown for a worker's condition functional ability and

the demand s of their usual job.  Transitional work is an especially poor fit as the job assignment

may have little or no relationship to the usual job.  It is often the case that the transitional work

assignment has been designed to put little or no demand on the affected body part.  Another

obvious variation in injured workers in the variation of severity within a same diagnosis.  This

results in a paradox with a case manager considering extent and nature of treatment while

simultaneously being concerned with over-treatment and excessive disability.  The disability

duration guidelines do not account for multiple diagnoses.  Precise quantification of the effect on

the variables on disability duration is beyond the scope of any existing guidelines.  However,

organizations frequently mandate use of guidelines all the time so that this exclusion is violated

and claims managers make inappropriate decisions. *Id.*

Some guidelines are explicit in setting forth limitations concerning their use.  The

Disability Duration Guidelines for the Workers' Safety & Compensation Commission of the

Northwest Territories and Nunavut state that the guidelines are not intended to "coerce injured

47

workers back to work nor are they provided to legitimize periods of unwarranted disability."

The guidelines are not meant to "replace the reasoned clinical judgements of attending health

care professionals regarding the injured worker's absence from work during recovery."  The

guides need to be utilized in conjunction with all the combined information in an injured

worker's case.  *The Medical Disability Advisor*, 5th ed. (2005) by the Reed Group, Ltd. , in its

Introduction

(pp. 12 - 14) states that disability is relational concept and does not equal functional impairment.

The vast majority of people with disability have minimal objective findings on careful medical

evaluation.  For example, pain is the most common disabling condition which is impossible for

another person to observe or measure directly.  Managing medical disability by utilizing

disability duration guidelines is, admittedly, and imperfect approach.  These guidelines are not

intended to be used as a device to coerce workers back to work when they are unable to perform

their normal duties.   Use of the tool was to be done with "prudence, compassion, and

thoughtfulness", and, in so doing, "treat everyone the way you, yourself, would like to be

treated."

In *Rorabaugh v. Continental Cas. Co.*, 2006 WL 4384712 (C.D.Cal. 12/8/06), it was

ruled that the disability duration guidelines employed contain qualifications that should have

caused reconsideration when there are complications or co-morbid conditions.

Disability guidelines in Europe were criticized for still needing more research on the

functional capacity of people with disabilities and on persons with chronic diseases.  El de Boer,

W.  Evidence-based guidelines in the evaluation of work disability: an international survey and a

comparison of quality of development.  *BMC Public Health*.  September, 2009; 9: 349 (online

publication)(Supporting literature attached hereto as Exhibit No. 9).

CONCLUSION:

The Defendant has offered nearly no substantive information and no documentation in response to the targeted discovery rendered which is appropriate under ERISA as demonstrated by the many case precedents throughout the country and the recent binding precedent of this Court.  In response, the Defendant offers mostly the same form objection time and again, the substance of which is completely belied by the information produced by the Plaintiff which reveals the basis for conflict of interest during the review of his denied long term disability claim. Further, basic bookkeeping tools will locate and/or provide most of the information requested.  For this reason, the Defendant "doth protest too much."[7]  It is even more obvious that answering of any discovery request is considered "unduly burdensome" by the Defendant.

For this reason, Plaintiff requests that the Defendant be compelled to produce the requested documentation as amended in this Motion.

Respectfully submitted,


_____/s/_____
Scott B. Elkind, Bar 10810
Elkind & Shea
801 Roeder Rd., Ste. 550
Silver Spring, MD 20910
P: (301) 495-6665
F: (301) 565-5111
Attorney for Plaintiff


Plaintiff requests oral argument on all issues raised herein.
_____/s/_____

_____

[7]William Shakespeare.  *Hamlet*. Act 3. Scene 2: 222 - 30.

49