

# [ST-26] Statement on the Use of Proprietary Guidelines by Managed Care Organizations

## [by the American College of Surgeons]

The Board of Governors of the American College of Surgeons is concerned about the use of "guidelines" by managed care or other health care organizations in determining hospitalized patients' lengths of stay and the appropriateness of other medical services for patient care. The concept of guidelines and their patterns of usage have been thoroughly evaluated and discussed by the Board of Governors Committees on Ambulatory Surgical Care and Surgical Practice in Hospitals. As a result, this position paper is presented to assist practicing physicians and surgeons in understanding practice guidelines and in managing patient care in a responsible manner. It is also intended to educate the agencies that formulate and utilize guidelines that affect patient care. It is necessary that third-party payers understand the proper course a physician or surgeon must take in order to adhere to professional ethics and to the principles of the American College of Surgeons.

### General concepts about guidelines

Guidelines are an expected part of medical practice in today's society. However, guidelines cannot be blindly accepted or considered inviolate. If that were to be the case, they would cease to be guidelines and would become "standards" or even "mandates." Guidelines and their application must be directed primarily toward the well-being of the patient. They should refer to efficiency with regard to time, safety, and utilization of resources for patient care, and should NOT be used as a means to maximize profit or for any other purpose that does not have the patient as the primary concern.

Guidelines must be based on appropriate data and research. They should reflect outcomes, and should be constantly monitored, evaluated, and updated. Outdated decisions have the potential of adversely effecting patient care and obstructing medical advances. The purpose of guidelines is exactly that of being "guides." They therefore must be formulated so that they serve an educational purpose for the physician and other health care providers in the interest of high-quality patient care. Punitive or disciplinary emphasis is counterproductive.

Guidelines can in no way encompass every diagnosis or treatment of all disease states, nor can they include the variations that occur in the complexity of the human response to disease processes, which includes co-morbid conditions. Where clear discrepancies of opinion exist, the licensed physician as the caretaker of the patient must be responsible for guiding the individual patient's course leading to diagnosis and treatment.

Guidelines should be formulated such that they cannot automatically be used as a basis for disciplinary action or litigation if the physician or surgeon determines that strict adherence to their provisions is not in the patient's best interest. The guidelines should be flexible to permit variations for patient condition and circumstances and should provide options for these variations, including severity of illness and co-morbid conditions. The guidelines should be formulated to consider the totality of an episode of care. For example, discharge criteria must take into account the supportive resources that are available to the patient, such as convalescent care, home care, hospice care, family availability, and so on.

Ideally, guidelines should be formulated "locally" so that consideration can be given to physicians' and other health care providers' knowledge about standards of care, as well as to the availability of local resources and community needs. Since the formulation of guidelines is an expensive process in terms of time and expertise, guidelines that have been developed regionally or nationally can be utilized after careful modification or adaptation to the local hospital, community, or medical society level. Guidelines that serve to restrict care for reasons other than the patient's well-being are not acceptable.

**Physicians' role**

Physicians as the primary health care providers should be involved in and responsible for the approval and implementation, review, and modification of all guidelines that affect medical care. It is incumbent on medical leadership and the individual practitioner to be diligent in the responsible evaluation and subsequent implementation of guidelines. Undesirable or unproved guidelines or portions thereof must be rejected and the objections appropriately documented.

Guidelines that are formulated and maintained through this rigorous process should be followed in good faith. Exceptional circumstances and variations in patient condition or circumstances should be anticipated and documented. Patterns of exceptions should lead to refinement of the guidelines.

**Governmental role**

Guidelines for specific disease processes developed by governmental agencies or mandated by legislation are inappropriate. These guidelines are subject to the same arbitrary decisions that interfere with the physician's primary responsibility for patient care. They often are unable to assess individual patient care needs, and thus cannot set appropriate standards for diagnostic and therapeutic procedures and lengths of stay.

Appropriate changes in legislatively mandated guidelines are difficult to achieve. Once promulgated, regulated care cannot easily be updated and made current in a timely fashion.

An appropriate role for government would be to: (1) reaffirm the physician's responsibility for patient care; (2) ensure patient access to health care; (3) provide for patient choice and individual responsibility; and (4) protect against abuses of the health care system by providers, insurers, and litigators.

The American College of Surgeons believes in the right of the patient to choose a physician and the right of the physician to freely direct the care of the patient. Guidelines can be used to assist the physician, surgeon, and other health care providers toward achieving this goal, but they should not impede the process or deviate from this purpose. The American College of Surgeons is committed to protecting the patient's well-being and the physician's role in providing efficient, appropriate, and comprehensive health care.

*Reprinted from* **Bulletin of the American College of Surgeons**
Vol.83, No. 03, March 1998

**Statements**

This page and all contents are Copyright © 1996-2000
by the American College of Surgeons, Chicago, IL 60611-3211

 **"Ask Dr. J"** 

The "Ask Dr. J" columns are authored monthly by Jennifer Christian, MD, MPH, President of Webility Corporation. See previous columns at www.webility.md.

Dr. J's columns also appear in the monthly Bulletin of the Disability Management Employer Coalition (DMEC). To purchase a book of Dr. J's collected columns, go to www.dmec.org.

The columns often summarize issues discussed by the Work Fitness and Disability Roundtable, a free, multi-disciplinary e-mail discussion group moderated by Dr. Christian. Apply to join the Roundtable at www.webility.md.

### July 2005 – Disability Duration Guidelines

Dear Dr. J:

I'm a longtime case manager, but new to supervision. Our vice president decided to buy disability duration guidelines for each of us to use. We didn't use guidelines much in my prior positions. The guidelines he bought have a low, middle, and high number of days for each condition. We don't really know which numbers to use and when. I guess I really don't know what duration guidelines are or what to do with them. Any advice?

Cindy from Cincinnati

---

Dear Cindy:

You're not the only one who is uncertain how to use disability duration guidelines. It's interesting to me how many companies are using guidelines without a clear understanding of their potential value, as well as, their potential pitfalls. I've been doing some "deep thinking" about duration guidelines recently, and have some ideas to share with you that I hope will be useful. Prepare to "put your thinking cap on". After all, we ARE talking about numbers!

Disability duration guidelines are reference materials that provide an estimate of how long an injured worker should be out of work for a given medical condition. They are typically organized by medical diagnoses (ICD9 and DSM-IV), body parts, or presenting symptoms. Basically, you look up the medical condition, specify the rough nature of the worker's job, and the guideline tells you how long a typical injured worker with that condition is likely to be out of work.

Prior to the development of disability duration guidelines, case, benefits and disability managers all had to rely on their personal experience or anecdotal advice from others in deciding whether disability durations were appropriate or not. Guidelines are intensely attractive because they appear to provide an independent, authoritative source of reliable information.

Disability duration guidelines can potentially be used for three main purposes:

- To guide return to work efforts

- To estimate future claim costs (assist in reserving)

- To measure disability management performance

There are several sets of disability duration guidelines widely available in the marketplace. Example of freestanding, widely available, and recently updated guidelines include:

- *Presley Reed's Medical Disability Adviser* published by Reed Group, Ltd.

- *Official Disability Guidelines* (ODG) published by the Work Loss Data Institute

- *Occupational Medicine Practice Guidelines* published by the American College of Occupational and Environmental Medicine (ACOEM)

In addition, some proprietary automated case management or utilization management systems include guidelines as an integral part of their offering, for example, Interqual, Intracorp's ICMS, and CORE's WOMP systems all provide guidance on expected disability durations.

Those who use guidelines often match the guideline numbers with the current length of disability in order to see how they are doing. They feel that there's no need to do anything until the mid-point or optimum date has been reached, and that something really must be done once the claim reaches the maximum or "at risk" date. This strategy is designed to produce poor results.

If you want your company's claims overall to be as well managed as the claims in the disability duration reference book's database, most of your claims must have durations shorter than the optimum or mid-point duration in the disability duration guidelines. In fact, the bulk of your claims have to beat the "average" numbers because claim durations are not evenly distributed around the average. The curve is not actually symmetrical. It is so skewed to the left that it looks like the right half of a bell curve only – because there are waaaaaaaaaaay more cases with short durations than long ones.

To illustrate, I have drawn you a couple of graphs on the computer. Not beautiful, but I hope they get the point across. In both examples below, the height of the curve at each point is determined by the number of observations (people in the weight example, and illness episodes for the disability duration example).



both mean & median = 165 lbs

0 lbs                320 lbs

Bell-shaped curve
or "normal" distribution
Example: Body weights

median = 3 days
mean = 21 days

0 days                7 years

Left-skewed distribution
Example: Days of disability

For disability durations, the lower limit of durations cannot get any shorter that 0 disability days, but the upper limit has a very wide range – up to a lifetime of disability days. And, most cases for many conditions have close to 0 disability days. So, under these circumstances, the difference between the median and the mean becomes important. Remember the difference: To calculate an "average" or arithmetic mean, add up all the disability days for all the cases and then divide by the number of cases. To calculate the median, find the middle case, the one where there are as many cases with shorter durations as there are cases with longer durations. Mean durations will be significantly longer than median durations, because of the large number of disability days being contributed by a small number of cases with really long durations. I urge you to use medians whenever you look at your case distributions. If your company counts the change in total disability days lost or saved, your numbers will be very skewed by outliers. In my opinion, if you want to see evidence of your increasing power to manage disability, track the change in median disability days.

If your organization intends to reduce the total number of disability days for the whole claim population, you must find a way to beat that optimum or mid-range number almost all the time. The way to do that is to always aim for the minimum or best practices duration and take steps to assure that this is what actually happens – and accept that you will hit it most, but not all, of the time.

However, it takes too much time and effort (and money) to try to shorten durations on all cases – you'll spend more money than you save, managing every case one at a time. In order to move your company's overall "average" severity down, the best way is to study what happens in "typical" claims that go too long. Think about how unnecessary days away from work get caused, and set up a method to address those causes. Focus on low cost and systematic changes that will shorten severity in typical cases, which will conserve your resources for the hands-on management of the few, but very complicated claims. The happy side effect of this approach is that as you are getting better at shortening disability on "typical" claims, you will also be strengthening your ability at reducing severity on "difficult" claims as well.

Here is a list of the current and potential uses of disability duration guidelines for your organization.

a. **Duration Guideline as a safe zone.** Disability duration guidelines can create a false sense of security and lull return to work coordinators, case managers and claims handlers into inaction until suddenly the deadline is here and the claim is out of control. Waiting until the duration on claims goes beyond the longest deadline is swinging into action too late.

b. **Duration Guideline as initial prediction.** It is worthwhile to make an initial prediction of disability duration, and to keep that historical prediction, unmodified, in a database in order to compare the eventual actual duration against that first estimate. As a comparison, in the budgeting process, the year-in and year-out comparison of budgeted to actual is a way that skill of the management team gets developed and evaluated.

c. **Duration Guideline as today's best guess about what will really happen.** Your system should allow you to record a predicted disability duration at every update. It is important to allow evolving knowledge of a situation to change the prediction of the outcome – to enable the claims organization to make decisions based on the most realistic assessment of the current situation. (The downside of this is that a weak case manager can simply keep extending disability durations rather than be confronted with the fact that his/her claims keep missing deadlines).

d. **Duration Guideline as tripwire to trigger increased effort / other activities.** Different expectations should be set for the intensity of case management activities depending on where the claim is with respect to the originally predicted duration. For example, a claim that has exceeded the median duration should be investigated to see what the problem is. A claim that has exceeded the 75%ile needs a full court press unless there is a specific reason why it is not needed.

e. **Duration Guideline as "the number to hit" or (better) the "the number to beat".** If the "number to hit" is the same as the conservative figure used for reserving, there is little likelihood that systemwide outcomes will improve. If everyone does their best to hit the reserve number, sometimes they will be successful and sometimes they will not and you're likely to end up at the status quo – or even worse. However, if the "number to hit" is set below (shorter than) the duration predicted for reserving purposes, the chances are better of reducing disability durations for the system as a whole. People perform better when they have a goal.

f. **Duration Guideline as a communications tool.** Duration guidelines developed by third parties can serve as an authoritative reference. The guideline can help patients, doctors, employers and insurance companies establish and share appropriate expectations, given the actual circumstances of the situation. Respected, evidence-based, and explicit guidelines carry much more weight than arbitrary or confidential ones, and thus protect against premature return to work, as well as needlessly prolonged absence.

g. **Duration Guideline as an aid to setting reserves.** Estimating duration for purposes of setting reserves is a conservative business. A clear-eyed and realistic (as opposed to optimistic) assessment of the claim situation and estimate of its most likely outcome is required in order to help set reserves appropriately. (It is not good form to keep revising reserves, especially upwards.)

h. **Duration Guideline as performance standard.** Given all the limitations of guidelines, it is probably not wise to hold case, claims, benefits or RTW managers accountable case by case for getting individual injured workers back to work within the predicted durations. However, a powerful way to evaluate the effectiveness of staff members or teams would be to start comparing actual vs. estimated durations across whole caseloads or other large groups of claims. What is not measured is not managed – and competition to see who is producing the best results would put more zip into performance.

i. **Duration Guideline as aggregate system benchmark.** Imagine how powerful it would be if there were benchmark standards set for median duration of disability for the most common injuries across the whole book of business – and your boss got a report every month tracking the actual performance of each operating unit against those benchmarks. In addition, innovations in claim and case management could be tracked for their effectiveness in reducing median durations.

## My Recommendations Regarding Use of Disability Duration Guidelines

Distinguish the multiple uses of disability duration estimates. Use different words to describe the numbers you are using for different purposes.

In order to reduce average disability duration per claim, the tripwire that triggers activities designed to reduce lost time MUST be set earlier than the mid-point or optimum duration. In

other words, you cannot move the whole bell-shaped curve to the left by trying to reduce disability in a few extreme cases. You need to change what happens in the typical cases, too!

Start using minimum or best practice disability durations as the number to "hit", and optimum or mid-range numbers as the number to "beat" and "at risk" durations as the number to "avoid at all costs".

Require documented evidence of medical complications and plans to address any red flags for claims that exceed optimum mid-range durations. Discovery of red flags probably requires extension of the predicted disability duration for reserving purposes, but should also trigger a more aggressive or innovative approach to case management. Distinguish between red flags that are biological and thus unavoidable (e.g. age and co-morbidities) vs. those that can be managed (lack of compliance, employee/employer issues). If any of the red flags are non-biological, then your staff should view the new longer duration guideline as the new "number to beat".

Encourage (and reward) intellectual honesty. Reward case and claims managers who are taking risks, and don't punish them if they don't make it. One way to do this is to use one number as the goal, another as the tripwire, and yet another as the reserve projection. As long as the reserve number is beaten, the organization is ahead. On the other hand, case managers whose claims rarely even hit the tripwires, and who consistently achieve their goals deserve extra recognition.

## Limitations of Guidelines

There are several important complications that must be dealt with in the practical application of guidelines. These complications are so significant that today's guidelines are simply unable to deliver their full theoretical value. On the other hand, there is some significant value to be had from using guidelines as a rough guide. To put it bluntly, they are better than nothing.

The first complication is that duration guidelines based on "actual data" reflect the current reality that unnecessarily prolonged disability is very common. The "minimum" or "best practices" duration shown for the sedentary job classification is probably the best available data on the "real" duration of medically-necessary disability. The other (longer) disability durations shown for that same condition for workers in other job classifications are actually caused by a mismatch between the workers' current functional ability (which has been temporarily altered by the medical condition) and the demands of their usual jobs. In other words, the increased length of disability is NOT medically-required, rather it is caused by the demanding nature of the work itself. Change the work, shorten the duration.

Thus, the effect of a given medical condition on any injured worker's ability to do his or her job is often very dependent upon the specific functional capabilities the job requires. There are tens of thousands of functions the human body can perform and just as many job descriptions. To make guidelines workable, job requirements have had to be grouped into a manageable, small number of categories. To apply a guideline in a given situation, you must first decide what job category to use. It is sometimes very clear what category is appropriate to use, but often it is not. The indicated duration can change significantly based on this choice.

Transitional work is an especially poor fit for duration guidelines, because a transitional work assignment may have little or no relationship to the "usual job". It is often the case that the transitional work assignment has been designed to put little or no demand on the affected body part.

There are numerous variations in the situations of injured workers with the same or similar diagnoses. For example, diagnoses can vary over time as conditions evolve from one problem to another (for example, angina progressing to heart attack) or as the physician continues the work-up and makes findings (hip pain becomes hip arthritis and then total hip replacement).

Another obvious variation is severity. For example, is the ankle sprain minor, medium, or major? Medical diagnostic databases do not include information about the severity of the injury; it must be inferred from the treatment. This is the paradox: although we are concerned about over-treatment and excessive disability, we are forced to use the extent and nature of the treatment to infer severity and predict disability duration.

Other variability exists as well. Identical injuries happen to individuals who are young and otherwise well, and to ones who are older and infirm. Some already have multiple diagnoses (co-morbidities). The medically-appropriate disability duration can vary greatly as a result. Disability duration guidelines generally try to deal with this issue of biologically-based variability by explicitly recommending that they NOT be used on multiple-diagnosis cases or cases with medical complications. However, organizations that decide to use guidelines frequently say they want them used all the time, so claims and case managers often violate this exclusion, and make inappropriate decisions.

Still another form of variation has to do with the psycho-social context in which the injury is occurring – the workers' relationship with the employer, the employer's ability or willingness to support return to work, the presence of a lawyer, and so forth.

Precise quantification of the effect of each of these variables on disability duration is beyond the scope of any existing guidelines – and yet that is what claims organizations wish they could use guidelines for. It is tempting to use them inappropriately. Their limitations do not make guidelines useless – but they do reduce their value. These limitations must be taken into account so that guidelines are appropriately used and mistakes avoided.

**Summary**

Reference materials that set disability duration guidelines are an asset to case, claim, benefit and RTW managers because they provide a more plausible basis for expectation setting, reserve setting, and allocation of time and resources than do personal experience and anecdote. However, all the reference guides available today have significant limitations and are not sufficiently strong to be relied on blindly. The impact of using disability guidelines and disability duration estimates in many companies today is blunted because the same words are being used to describe several different purposes and uses of these estimates.

I recommend that more distinctions be made between the different purposes and uses on the individual claim level. Later, when your company has made more progress on its efforts to improve its data warehouse and management reporting capabilities, the ultimate power of disability guidelines to serve as benchmarks for aggregate performance will become apparent.

Smiling,

Dr. J

# DISABILITY DURATION GUIDELINES

## Workers' Safety & Compensation Commission of the Northwest Territories and Nunavut

# INTRODUCTION

This document has been produced to provide guidelines in estimating the usual periods of work disability sustained by workers following various work-related injuries and treatment procedures.  We must be cognizant that these are reasonable duration guidelines only.  The guides do not set a return to work date or indicate insurance disability benefit coverage.  The upper limit of the durations represent the time when we must investigate reasons why a worker has a delayed return to work.  The lower limit of the durations do not dictate required absence from work.  A worker employed in a heavy work category may be able to access an earlier return to work, in a less demanding work category, provided the employer has alternate or modified work positions.

The guides are not intended to coerce injured workers back to work nor are they provided to legitimize periods of unwarranted disability.  These guides do not replace the reasoned clinical judgements of attending health care professionals regarding the injured worker's absence from work during recovery.  Many factors have a direct influence on recovery times including psychosocial issues, concurrent disease, age and the specific treatments prescribed as well as any untoward complications.  The guides are to be utilized in conjunction with all the combined information regarding an injured worker's case in determining an appropriate disability period.

A Practical Reference
for Diagnoses and Procedures

The material on this page was copied from the collection of the National Library of Medicine by a third party and may be protected by U.S. Copyright law.



**Workplace Guidelines
for Disability Duration**

**Fifth Edition**

**Volume I**

# Presley Reed, MD

Editor-in-Chief

Reed Group, Ltd.
Westminster, Colorado, USA

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is published with the understanding that the author, editors and publisher are not engaged in rendering medical, legal, accounting or other professional service. If medical, legal, or other expert assistance is required, the service of a competent professional should be sought.

*Editor-in-Chief:* Presley Reed, MD
*MAB Chair:* Jennifer Christian, MD, MPH
*Developmental Editor:* Stacey Grace
*Senior Consultant:* Christopher R. Brigham, MD, MMS, FACOEM, FAADEP, CIME
*Project Manager:* Catherine Weldon, MS
*Content Manager:* Louis Burkhardt, PhD; Lucy Shannon
*Data Collection/Analysis:* Kathi Dangerfield, MS; Doug Dillard, MA
*Database Engineers:* Mike Hellem; David Shrader; Dawit Agonafer
*Web Interface Programmers:* Jack Nichols; Kamolrat Therawat
*Book Design and Layout:* Creative Quotient (a Repro India Ltd. Enterprise)
*Illustrators:* Frank Forney; Laurie O'Keefe
*Cover Design:* Beauchamp Group, Inc.

**Library of Congress Control Number: 2005903044**

THE MEDICAL DISABILITY ADVISOR: WORKPLACE GUIDELINES FOR DISABILITY DURATION, Fifth Edition
ISBN 1-889010-03-0

Copyright © 2005 Reed Group, Ltd. All Rights Reserved.
No part of this publication may be used, reproduced, stored, or transmitted in any form or by any means—graphic, electronic, mechanical, including photocopying, recording, taping, information storage and retrieval systems, or otherwise—without the prior written permission of the copyright owner.

Also available as Software for Windows, MDA Internet, and MDA Guidelines Data Integration.

Direct comments or inquiries to:
Reed Group, Ltd.
10155 Westmoor Drive, Suite 210
Westminster, Colorado 80021 USA
303.247.1860
303.247.1863 FAX
800.347.7443
Internet address: www.presleyreed.com or www.mdainternet.com

Fourth and Third Editions published by Reed Group, Ltd.
Boulder, Colorado
ISBN 1-889010-02-2 and 1-889010-01-4

First and Second Editions published by LRP Publications
An Axon Group Company, Horsham, Pennsylvania
ISBN 0-934753-52-0

Additional copies may be purchased from:
Reed Group 800.347.7443 or 303.247.1860

Printed on acid-free paper.
Manufactured in the United States of America.
Fifth Edition.
99 98 97 96 95 94                                                              6 5 4 3 2

The material on this page was copied from the collection of the National Library of Medicine by a third party and may be protected by U.S. Copyright law.

## Preface

In 1981, while working in psychiatric practice, I accepted an invitation to serve as a consultant to a pain control center. During the course of this work, I became fascinated with individuals who were away from work on extended leaves of disability when, in my opinion, subject to only minor illness or injury with little or no positive findings of organic pathology. I later had the opportunity to serve as a contract occupational physician to a large multinational corporation where my interest in the issues of medical disability, absenteeism, and employee morale in the workplace increased. I founded Reed Group, Ltd. to provide proprietary research on these issues. This work is the basis for the development of this reference text.

Disability is a complicated psychosocial problem that extends beyond the sole question of illness or injury. Many factors contribute to the complexity of the problem. They include, but are not limited to an individual's values and beliefs; the role of illness in the individual's childhood/family experience; the specific symbolic meaning of illness or injury to the individual; the individual's relationship with his/her employer; occupational alternatives available to the individual; the individual's financial situation; economic issues (the local economy, incentives associated with illness and disability); motivation and ethics of the treating health care professional; the occupational health professional or case manager's role and level of involvement; the quality of medical care and case management provided; workplace accommodations made available by the employer; and the employer's policies/practices, culture, and values.

Disability is a relational concept; it does not equal functional impairment. It speaks to the issue of one's relationship to real or perceived functional impairment with other aspects of one's life. When most people think of people with disabilities, they envision individuals with dramatic functional limitations (e.g., a survivor of a catastrophic accident). This is not the case. The vast majority of people with disabilities have minimal objective findings on careful medical evaluation and appear to the outside observer to be "whole." Pain for example, the most common disabling condition, is impossible for another person to observe or measure directly.

In assessing a potential "disability" case, one must examine not only the individual but also the context in which the problem is occurring. Managing medical disability by utilizing disability duration guidelines based upon diagnosis or procedure is, admittedly, an imperfect approach. However, when used judicially, taking into account the totality of information about the employee's medical condition and the work environment, as well as the accommodations available, their use can yield surprising results. The benefits accrue not just to the employer, but to the employee as well. It results in better, more timely medical care, earlier return to productive endeavor, and more satisfied, productive employees.

Reed Group's research and experience in the workplace repeatedly demonstrates that workers who feel valued as people and for their contributions are more reliable and productive. Workers who are treated with respect and who are recognized for their efforts, continually work to reconfirm their value within the organization, even in the event of illness or injury. In so doing, they strengthen their own self-worth and self-esteem as workers. This is substantiated by the fact that millions of men and women continue to perform productive work in spite of significant emotional or physical discomfort and/or impairments. On the other hand, workers who feel "used" and unappreciated make few strides to return to productive endeavor when disabling illnesses or injuries occur.

Employees better understand their value, and respond accordingly when employers demonstrate sincere concern about the worker's well being. The employer's concern can be communicated in all areas of the business and may be manifested in many different forms. An attentive employer might

provide a recovering employee with additional days off, beyond the normal guidelines, to insure full recovery. The employer might make provisions to allow an employee to return to work early with medical consultation and specific accommodations for the employee's medical condition (e.g., a temporary, less physically demanding job or part-time position). Workplace accommodations offer proven dividends to both the employer and the employee.

The multifaceted nature of medical disability made the development and revision of a comprehensive reference tool challenging. Degree of disability can be greatly influenced by the individual's state of mind. These guidelines cannot measure one of the most important "state of mind" variables in the determination of disability, the individual's motivation. Motivational factors are commonly overlooked when assessing disability. As a result, disability evaluations seldom reflect the employee's motivation to return to full-time, productive endeavor. We have all seen and admired workers who have significant physical disabilities and perform to the limits of their capacities. Likewise, we have seen workers who are seemingly normal on examination, but are unable to perform any productive work.

These guidelines are not intended to be used as a device to coerce workers back to work when, for whatever reason, they are unable to perform their normal duties. Moreover, it is hoped that this tool will not be used to legitimize disability for those who lack motivation to reassume their workplace responsibilities.

*The Medical Disability Advisor* is intended to be used as a tool against which the user should weigh the totality of his or her available knowledge and the specific case information. These guidelines should always be used in conjunction with the combined information available regarding the individual case (e.g., specific medical condition, the ongoing medical record and treatment program, the nature of the job itself, availability of employer-provided

workplace accommodations) when attempting to determine the appropriate length of disability.

October 1994

The wide acceptance of the First and Second Editions encouraged our development of a much more detailed and precise document. The improvements in the Third Edition represent input from MDA users and many thousands of hours of research. It is our hope that all users of these guidelines will continue to provide us with comments and suggestions, and participate in ongoing research designed to further improve, refine, and validate this tool.

Medicine is an inexact and ever changing science. New medical technologies and more effective treatments, as well as better understanding of the most important psychosocial factors that affect disability, will alter our future perceptions and expectations of the disability phenomenon and render our current thinking obsolete.

*The Medical Disability Advisor* reflects current knowledge and will continue to expand and improve in successive editions. *The Medical Disability Advisor* is a tool and a tool is only as good as its user. Please use this tool judiciously, tempering your decisions with thoughtfulness and compassion.

November 1997

It has been ten years since Reed Group published the First Edition of *The Medical Disability Advisor*. Over the years, much has changed, though much has remained the same.

Employers continue to struggle with employee absenteeism from all causes, and with the associated challenges of maintaining productivity.

Employees continue to search for meaning and relevance in their work, while trying to balance the multiple demands of a faster paced technological society.

In the United States, new regulations have been passed to assist workers. The Americans with Disabilities Act requires employers to reasonably

accommodate workers at their job. Likewise, the Family Medical Leave Act provides opportunity for workers to care for themselves or their family members in circumstances of serious illness.

Disability management programs have become the norm and *The Medical Disability Advisor* has become an integral tool within the industry. Nevertheless, lost time incidence and average length of disability have not significantly changed.

Social forces, economic incentives (and disincentives), home life issues, the economy, safety and ergonomic conditions, employee morale, labor relations conditions, and employee motivation continue to be major factors that have an impact on disability experience.

The Fourth Edition offers many new additions and improvements, and although *The Medical Disability Advisor* is the most comprehensive resource available, it is still only a tool. The MDA, like any other tool, has its limitations.

No reference text can take into account all of the important variables that may potentially have an impact on any individual medical case. No text can (or should) attempt to mandate the recommendations of the treating caregiver. No text can (or should) substitute for the strategy agreed upon by the patient and their caregiver.

We urge you to use this tool in the manner in which it was conceived—with prudence, compassion, and thoughtfulness. When using this tool, treat everyone the way you, yourself, would like to be treated.

March, 2001

Since the time of publication of the First Edition of this work over 14 years ago, its user base has grown to be quite large with a global reach. We are fortunate that the observed data sets grow and become more robust each year. Thanks to our users' invaluable feedback, the tool itself has many more useful features than in 1991.

Among most workplaces, medical disability and medically related lost time and lost productivity remain a concern, and judicious reductions in lost time have been seen. Reed Group measures our own disability management results against the MDA's benchmarks, and our users, likewise, share their measured results. We recognize the impact this tool has had in the workplace, both by the measurable results of lost-time savings and by the anecdotal comments of its users who gain clarity and encouragement from its guidance.

The MDA has benefited greatly from the talents of hundreds of professionals—writers, editors, project managers, researchers, physician reviewers, etc. Their contributions are greatly appreciated. Many injured and ill workers will benefit directly from their insistence on improved accuracy relying on observed (not self-reported) data. The MDA is the most widely utilized and comprehensive evidenced-based tool available; however improved with each edition, it is only a tool and a tool is only as good as its user.

Many variables, other than those enumerated in this text, impact outcomes. Please accept my deepest thanks to those who helped create this tool and to those who use it. Remember to always use this tool with thoughtfulness and compassion.

June, 2005

Not Reported in F.Supp.2d, 2006 WL 4384712 (C.D.Cal.)

Motions, Pleadings and Filings
Judges, Attorneys and Experts
Only the Westlaw citation is currently available.

United States District Court,
C.D. California.
Willow RORABAUGH, Plaintiff,
v.
CONTINENTAL CASUALTY COMPANY, Edward D. Jones & Co. Long Term Disability Plan; Edward D.
Jones & Co. Medical Plan; Edward D. Jones & Co. Pension/Retirement Plan; Defendants.

No. CV 05-03612 SBCRCX.
Dec. 8, 2006.

Corinne Chandler, Glenn R. Kantor, Kantor and Kantor, Northridge, CA, for Plaintiff.

Robert F. Keehn, Galton & Helm, Los Angeles, CA, for Defendants.

FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: ERISA APPEAL

COLLINS, J.

*1 This case is an appeal from a denial of disability benefits under a plan subject to ERISA. The standard of review in this case is *de novo.* As such, the court may consider evidence outside the Administrative Record ("AR"). *Mongeluzo v. Baxter Travenol Disability Benefit Plan,* 46 F.3d 938, 944 (9th Cir.1995), *Abatie v. Alta Health & Life Ins.,* 458 F.3d 955, 970 (9th Cir., 2006). In addition to the AR, the Court will consider the deposition testimony of Dr. Robert Marks taken on May 5, 2006, to which Defendants have not objected. However, the Court will not consider the deposition testimony of Peter Strang taken on February 10, 2006 in the action entitled *Kathy McMahon v. Continental Casualty Company,* Civil Action No. 05-01292 CRB (N.D.Cal.). Having considered the evidence submitted and the arguments of counsel, the Court ENTERS the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a):

I. FINDINGS OF FACT

A. Background

1. Plaintiff Willow Rorabaugh ("Plaintiff") was employed as a Branch Office Administrator ("BOA") for Edward Jones & Co., a brokerage company. (AR 171).

2. In connection with her employment, Plaintiff was enrolled in her employer's short term and long term disability plans. Both the short term disability ("STD") and long term disability ("LTD") plans were administered by Continental Casualty Company ("CCC"). (AR 438).

3. During the last stage of her appeal, Plaintiff was advised that the obligation of CCC had been assumed by Hartford Life Insurance Company ("Hartford"). (AR 058).

B. Plaintiff's Initial Disability

4. On or about April 22, 2003, Plaintiff had back surgery performed by Dr. J. Patrick Johnson for spinal stenosis and applied for short term disability benefits. (AR 004, see also 177).

C. Plaintiff's Initial Claim for Benefits

5. On May 2, 2003, Edward D. Jones & Co. faxed CCC the paperwork required to initiate a claim. (AR 017-21).

6. At the time Plaintiff's claim arose, Edward D. Jones & Co. maintained a comprehensive, multi-benefit ERISA plan that included all insured and self-funded benefit programs, including short-term

disability ("STD") and long-term disability ("LTD"). (AR 336-40)

7. For both STD and LTD coverages, the term "total disability" is defined as:

"Being totally disabled means that, during the benefit waiting period and for the duration of your disability period, you are not able to perform the substantial and material duties of your regular job. For STD claims, your disability must result from a non-work related illness or injury. For LTD claims, your disability may result from any illness or injury. Total disability also means that you are not doing any other work for wages or profit for which you are, or may reasonably become, fitted by education, training or experience." [emphasis added] (AR 391).

8. The "Physical Demands Analysis" submitted by Edward D. Jones & Co. described Plaintiff's position as requiring two hours of sitting at one time, and working with a computer, calculator and telephone. The job required climbing, stooping, kneeling and crouching. Both right and left hands were required for grasping and 100% finger dexterity was required. Upper extremity range of motion was also required, as was occasional twisting, reaching and bending. (AR 171-72).

**\*2** 9. Plaintiff's application for short term disability benefits was certified for 42 days, to June 2, 2003. CCC determined 42 days was the "usual duration" for a claim of plaintiff's nature. CCC did not request or review any medical records when it certified Plaintiff's disability benefits for this period of time. (AR 095).

D. Plaintiff's Further Discovered Disabilities, On-Going Medical Evaluation and Status
10. On May 29, 2003, four days before her benefits ceased, Plaintiff's physician, Dr. Mark Wolgin, referred her to physical therapy for her back surgery. (AR 234).

11. The initial consult with the physical therapist in June 2003, noted that Plaintiff had "significant left upper extremity involvement in addition to the involvement with the left lower extremity. Plaintiff's left arm exhibited "cog-wheel" type rigidity and intention tremor.[FN1] It was recommended that Plaintiff undergo neurological testing. (AR 235).

> FN1. "Cogwheeling" has been described as an alternate rigidity and relaxation of the limb, "like a catch, gives way, a catch, gives way ..." (Deposition of Dr. Marks, p. 33).

12. Plaintiff continued to receive physical therapy, at least three times a week from June to October 2003. Symptoms experienced by Plaintiff in July 2003 included increased shaking of her left upper extremity, fatigue and tremors. (AR 226).

13. On July 17, 2003, it was noted that Plaintiff had spasticity, rigidity and intention tremors in both her lower and upper left extremities. (AR 228).

14. By August 2003, physical therapy notes indicated that Plaintiff was having difficulty walking, which was improved after lying down. Her left arm exhibited weakness, tremors, and loss of dexterity. (AR 239).

15. On August 8, 2003, Plaintiff called CCC and advised that she had not returned to work in early June. As of this date, Plaintiff would have been eligible for long term disability benefits under the Plan. CCC did not send any long term disability claim forms to either Plaintiff or her employer. (AR 006).

16. Instead, CCC called Plaintiff's orthopedic surgeon, Dr. Johnson and left a message that medical records were needed. No medical information was received. (AR 006).

17. The claim was "closed" on or about August 13, 2003. Plaintiff did not receive notice of the closure. (AR 006).

18. Plaintiff was first seen on September 25, 2003 by neurologist, Dr. Mary Dyes. Plaintiff had

trouble walking, shuffled when walking, her left leg was stiff and rigid, and she could not lift. Dr. Dyes's preliminary diagnosis was that Plaintiff had <u>Parkinson's disease</u>. Dr. Dyes's opinion on that date stated that Plaintiff should remain on Total Disability. (AR 108-110, 204-06).

19. On October 16, 2003, Plaintiff again consulted with Dr. Dyes. She showed significant improvement by ambulating without a cane after taking the medication prescribed by Dr. Dyes during her first visit. Dr. Dyes recommended that Plaintiff stay on temporary disability until her symptoms had resolved adequately to return to work or until it was determined that she was not able to return to work. (AR 203).

E. Plaintiff's Claim for Long Term Disability Benefits
**\*3** 20. In December 2003, Plaintiff submitted a claim for long term disability, explaining that she had never returned to work after her back surgery and that she had been diagnosed with <u>Parkinson's Disease</u>. (AR 249-50).

21. Plaintiff also advised that she had major weakness on her left side, she could not sit more than one hour or stand more than fifteen minutes and that she had to lie down every few hours. Further, Plaintiff explained upon inquiry from CCC that her job allowed her to sit or stand when needed but she was having problems performing her job with her condition even before her surgery. She was not able to sit, had tremors and it was hard to work with people. (AR 05).

22. The December 16, 2003 Attending Physician Statement submitted by Dr. Dyes, together with Plaintiff's claim form, confirmed Plaintiff's report of her symptoms. Dr. Dyes reported that Plaintiff had left-sided stiffness, tremor, gait disturbance and shuffling. These symptoms were all listed as objective findings. While the form did not request an evaluation of Plaintiff's ability to endure prolonged sitting, Dr. Dyes did state that she was limited to standing not more than thirty minutes at a time. Dr. Dyes advised that Plaintiff cease work and listed her prognosis as "fair." (AR 224-25)

23. On December 23, 2003, CCC requested that Dr. Dyes complete a Functional Assessment Tool ("FAT") form, assessing plaintiff's capability of performing full time work, even if she was primarily seated with flexibility to stand or sit. (AR 09).

24. On the FAT form completed on February 27, 2004, Dr. Dyes stated that Plaintiff was not capable of performing full time work which was primarily seated, with flexibility to stand as needed. Dr. Dyes also stated that Plaintiff could not lift more than five pounds, could not engage in repetitive tasks using her hands, no reaching and no writing for more than ten minutes at a time. She could not sit for more than thirty minutes at a time and could not stand or walk for more than fifteen minutes. Dr. Dyes also stated that Plaintiff's return to work date be July 1, 2004. (AR 104-07, also at 200-03).

25. On or about May 26, 2004, CCC Nurse Case Manager Cheryl Fox, upon review of Plaintiff's medical records, concluded that Plaintiff's condition did not prevent her from returning to work. The nurse partly referred Dr. Dyes's November 13, 2003 and January 8, 2004 office notes (included as part of the FAT report) but only referenced the portion which stated Plaintiff had improved and was able to ambulate without a cane. The CCC nurse ignored Dr. Dyes' notation that Plaintiff was not capable of performing full-time work and that her anticipated return to work date was July 1, 2004. (AR 029, 104).

26. In its denial letter dated May 26, 2004, CCC concluded that Plaintiff was able to work because her job is "primarily seated with the option to sit and stand when needed" and because she was right-handed, the problems with her left hand should not preclude her return to work. (AR 029, 048).

F. Plaintiff's Appeal
**\*4** 27. On September 29, 2004, plaintiff appealed. She advised that her back problems (which necessitated the original surgery) caused debilitating pain and that her recent Achilles tendon problems would require surgery, which would place her in a cast for two months. Further, her <u>Parkinson's disease</u> caused fatigue and significant "off periods" during which she was unable to walk very well. Plaintiff concluded by stating that all three problems were debilitating in their own right but that combined, they were more than she could manage in a non-work environment, much less in the

workplace. (AR 064-65, 169-70).

28. On appeal, Hartford referred the claim to University Disability Consortium ("UDC") for medical review. (AR 165-66).

29. UDC referred the matter to Dr. Robert Marks, who submitted a report on November 11, 2004. He never examined, met with, or talked to the Plaintiff. (AR 140-43).

30. Instead of inquiring whether Plaintiff could perform "her occupation" (the applicable standard under the Policy), Hartford/UDC asked Dr. Marks to determine whether Plaintiff's "functionality" was at the "heavy, medium, light, or sedentary" level. (AR 075, 094).

31. Dr. Marks testified that his medical opinion was not based on any specific job, but rather, his opinion was based upon Plaintiff's ability to perform "any sedentary" job. (Marks Deposition, p. 44).

32. In rendering his opinion, Dr. Marks only mentioned two reports of Plaintiff's neurologist and did not refer at all to Dr. Dyes's February 2004 Functional Assessment, which had been specifically requested by CCC. Instead, Dr. Marks summarized Dr. Dyes's December 16, 2003 Attending Physician Statement as reporting that the physical limitations were specified as no lifting greater than 10 pounds, and standing for 30 minutes at a time, with 5 minutes to sit. Dr. Marks's report failed to note that the same Statement documented symptoms of left-sided stiffness, tremor, gait disturbance and shuffling. (AR 073-76).

33. While Dr. Marks admitted Plaintiff had rigidity and slowness in her left side and that she needed a cane, he opined it "probable" that as of June 2, 2003, Plaintiff could "carry out tasks at the sedentary level of effort." (AR 076).

34. Dr. Marks concluded that the "the documentation" did not reveal what types of repetitive movements were possible, but because there was slowness on the left side, activities requiring "rapid repetitive movements" of Plaintiff's left upper limb would be limited. (AR 075-76).

35. Hartford notified Plaintiff in a letter dated November 12, 2004 that the responsibility for the administration of her claim had been transferred from CCC to Hartford and that Hartford had decided to uphold the decision to deny Plaintiff's benefits. There were no further appeal rights given to Plaintiff. (AR 058, 061, also 146-149).

G. Final Correspondence and Instant Action

36. On December 9, 2004, Plaintiff wrote to Hartford, asking for a copy of her entire file. (AR 120).

*5 37. Hartford acknowledged receipt of this letter shortly thereafter, and sent a copy of the file to Plaintiff under cover of December 28, 2004. (AR 57, 43).

38. On February 17, 2005, the California Department of Insurance notified Hartford of a complaint filed by Plaintiff. The Department asked that Hartford respond directly to Plaintiff within 21 days, with a copy of its letter sent to the Department. (AR 52).

39. Hartford responded directly to Plaintiff on February 28, 2005, copying its letter to the Department. (AR 41-42).

40. The instant action followed.

H. Summary and Factual Conclusions

1. The termination of Plaintiff's short-term disability benefits was made on the basis of "usual **duration" guidelines** for back surgery. The **Duration Guidelines** contain qualifications that should have caused reconsideration when there are complications or co-morbid conditions. In this case, Plaintiff did develop such complications when she was recovering from surgery. She did not recover as anticipated and upon referral to a neurologist as a consequence of her complications, Plaintiff was diagnosed with Parkinson's Disease. (AR 04, 17, 21, 234, 235, 06, 110, 202).

2. The contemporaneous treatment notes all documented continuous walking difficulties, tremors, fatigue and left-sided rigidity. (AR 04, 17, 21, 234, 235, 06, 110, 202).

3. In this case, the occupational impairment was serious because Plaintiff was required to type, grasp, reach, bend, stoop and sit for two hours at a time. (AR 171-72).

4. Plaintiff's employer's Plan, of which Plaintiff is a participant, gauges disability based solely upon a "regular job" standard. (AR 391).

5. During this litigation, Plaintiff took the deposition of Dr. Marks to inquire what standard he actually used in ascertaining what Plaintiff could "probably" perform some "sedentary tasks." Dr. Marks testified that he did not consider Plaintiff's actual job requirements but instead utilized the barest minimum ability to perform "any sedentary job," meaning the ability to sit for thirty minutes at a time, with breaks. This standard was erroneous as a matter of law. (Marks Depo. 44-45).

6. Dr. Marks also conceded at his deposition that certain aspects of Plaintiff's job, i.e., sitting for two hours at a time, reaching and stooping exceeded the criteria he utilized when determining that Plaintiff had some sedentary capabilities. Dr. Marks further testified that the restrictions he found in prohibiting "rapid repetitive movements" of Plaintiff's "left limb," as described in his opinion, would include her left hand. (Marks Depo. 26, 44-45).

7. Defendants selectively reviewed the evidence and then evaluated Plaintiff's condition based upon a fabricated "any sedentary occupation" standard.

8. Hartford did not follow internal administrative requirements when it investigated Plaintiff's disability based on a "sedentary" work capability as opposed to her job. A "Best Practices" Memo on the interpretation of the "own occupation" phase of disability requires consideration of the employee's material duties as reported by the employer. (Declaration of Chandler, Ex. D, p. 418). Plaintiff's employer responded that Plaintiff was required to sit for two hours a time, bend, twist, stoop, use a computer and telephone and interface with the public. Hartford disregarded these requirements and instead based its decision on whether Plaintiff could perform "any sedentary" job. (AR 094).

*6 9. Moreover, Hartford's own internal Initial Investigation Protocols requires a claim representative to obtain medical records and conduct a "detailed" assessment of the claimant's ability to perform activities of daily living prior to a termination of benefits. The same Investigation Protocol also specifically requires a consideration of "co-morbid conditions and age." However, there was not such detailed assessment or review of medical records in Plaintiff's case by CCC when it initially terminated Plaintiff's benefits. [FN2]

> FN2. The Court notes the prolonged discovery dispute as to the Defendant's internal protocols. In fact, the defendant was ultimately held in contempt for its refusal to turn over certain internal documents ordered by the Court. However, the Court specifically finds that its decision in favor of Plaintiff would be the same without consideration of the documents referred in Finding No. 8 and 9.

10. This summary, as well as the Court's earlier findings, reveal that Defendants had ample evidence of Plaintiff's disability between June and November 2003. Plaintiff has been treated by at least three board-certified physicians Drs. Wolgin, Johnson and Dyes, who were Plaintiff's treating or attending physicians at the time that Plaintiff suffered from a medical condition that renders her unable to work in her occupation at the time of disability, as a BOA. The May 2003 recommendation for physical therapy by Dr. Wolgin, the back surgery performed by Dr. Johnson, the symptoms exhibited during physical therapy beginning June 2003, Dr. Dyes's notes and opinions as well as her Attending Physician Statement, Functional Assessment Tool form and Dr. Dyes's certification that Plaintiff was completely disabled all indicate a continuing back disability, Achilles tendon bone spur and Parkinson's disease. They are remarkably consistent with regard to the symptoms Plaintiff

experiences as well as the effect that those symptoms would have on her ability to perform her job.

11. The only support for Defendants' position came from a review of Plaintiff's records by a CCC nurse manager and Dr. Marks's report. However, Dr. Marks used an incorrect occupational standard and never personally examined Plaintiff. Moreover, Dr. Marks's report did not even discuss the FAT completed by Plaintiff's neurologist, Dr. Dyes.

12. The Court notes that inasmuch as any such hierarchy can be established between conflicting opinions of physicians <u>FN3</u> as to a single patient, the Court gives the greatest weight to Drs. Dyes, Johnson and Wolgin, who have spent some amount of time with Plaintiff and assessed her symptoms over time. <u>FN4</u>

> <u>FN3.</u> The Court gives no credibility to the record review performed by CCC's nurse manager, Cheryl Fox.

> <u>FN4.</u> Consistent with the ruling in *Black & Decker Disability Plan v. Nord,* the Court has taken only the facts of this case into account in assessing the credibility of the various physicians. <u>538 U.S. 822, 123 S.Ct. 1965 at 1970-71, 155 L.Ed.2d 1034 (2003).</u>

13. The clear weight of evidence under the *de novo* standard therefore establishes Plaintiff's total disability under the terms of the policy, which is whether Plaintiff can perform "the substantial and material duties of your regular job".

14. Accordingly, the Court concludes that Plaintiff met the definition for "Total Disability" at he time that her benefits were terminated on June 2, 2003. Therefore, CCC's decision to terminate benefits was wrongful, as was Hartford's upholding of CCC's decision.

15. Plaintiff is entitled to reinstatement of her benefits for the period from June 2, 2003 until the present.

16. Plaintiff is entitled to continued payment of those benefits for as long as is appropriate under the policy.

**\*7** 17. The amount of accrued benefits to which Plaintiff is entitled should be included in Plaintiff's [Proposed] Final Judgment, to which Defendants may then respond.

18. The amount of prejudgment interest should also be set forth in Plaintiff's [Proposed] Final Judgment (See Conclusions of Law, below).

19. Any conclusion of law which is deemed a finding of fact is incorporated herein by reference.

II. CONCLUSIONS OF LAW

1. This is a claim for benefits under the Employee Retirement Income Security Act ("ERISA"), <u>29 U.S.C. § 1001 et seq.</u> ; a participant may recover under <u>29 U.S.C. § 1132(a)(1)(B).</u>

2. This Court has jurisdiction pursuant to <u>29 U.S.C. § 1132(e) and (f)</u>, and venue is proper under <u>29 U.S.C. § 1132(e)(2).</u>

3. "[A] civil action may be brought ... by a participant or beneficiary ... to recover benefits due to h [er] under the terms of h[er] plan, to enforce h [er] rights under the terms of the plan, or to clarify h [er] rights to future benefits under the terms of the plan." <u>29 U.S.C. § 1132(a)(1)(B).</u>

4. This section of ERISA provides for: disbursement of accrued benefits, a declaratory judgment that the participant is entitled to benefits under the plan, and/or an injunction to prevent the plan

administrator from wrongly refusing to pay benefits in the future. *See, e.g., Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 146-47, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985); *Durham v. Health Net,* 1995 WL 429252, *2 (N.D.Cal.1995).

5. Plaintiff bears the burden of proof in this case by a preponderance of the evidence.

6. The parties have stipulated that CCC's decision to terminate Plaintiff's disability insurance benefits is subject to *de novo* review by the Court. *See Kearney v. Standard Ins. Co.,* 175 F.3d 1084, 1090 (9th Cir.1999); *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 114-15, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

7. The Court may consider evidence in addition to the AR when it is "necessary to conduct an adequate de novo review." *Mongeluzo v. Baxter Travenol Disability Benefit Plan,* 46 F.3d 938, 944 (9th Cir.1995), *Abatie v. Alta Health & Life Ins.,* 458 F.3d 955, 2006 WL 2347660 (9th Cir., 2006). Though *Kearney* establishes that "the record that was before the administrator furnishes the primary basis for review," the Court retains discretion to permit evidence not in the AR when the factual situation warrants it, such as when the veracity or completeness of the AR, or the credibility of the sources from which it was created, are at issue. *See, e.g., Kearney,* 175 F.3d at 1090-91; *Thomas v. Oregon Fruit Products Co.,* 228 F.3d 991, 997 (9th Cir.2000)(suggesting that evidence on "credibility of medical experts" might be considered on *de novo* review of denial); *Ellis v. Egghead Software Short-Term and Long-Term Disability Plans,* 64 F.Supp.2d 986, 991 (E.D.Wash.1999).

8. Plaintiff raised several challenges to the report submitted by Dr. Marks, alleging, *inter alia,* that Hartford did not request that Dr. Marks render an opinion regarding Plaintiff's ability to perform her regular occupation; that Hartford only requested Dr. Marks to render an opinion as to whether Plaintiff could perform a generic "sedentary" occupation; and that the Administrative Record was unclear regarding whether Dr. Marks was ever given a copy of Plaintiff's job description. Based on these allegations calling into question the credibility of a medical expert upon whose opinion Hartford substantially relied, the Court determined that it was appropriate to consider evidence outside the record, specifically Dr. Marks's deposition testimony.

***8** 9. When interpreting the terms of an ERISA plan, a court looks first "to the terms of the plan itself." *Nelson v. EG & G Energy Measurements Group, Inc.,* 37 F.3d 1384, 1389 (9th Cir.1994). Plan terms are interpreted "in an ordinary and popular sense as would a [person] of average intelligence and experience." *Evans v. Safeco Life Ins. Co.,* 916 F.2d 1437, 1441 (9th Cir.1990); *see also Hamner v. UNUM Life Ins. Co. of America,* 1997 WL 257515, *4 (N.D.Cal.1997).

10. "Total disability" is defined in the CCC plan in which Plaintiff was a participant as "Being totally disabled means that, during the benefit waiting period and for the duration of your disability period, you are not able to perform the substantial and material duties of your regular job. For STD claims, your disability must result from a non-work related illness or injury. For LTD claims, your disability may result from any illness or injury. Total disability also means that you are not doing any other work for wages or profit for which you are, or may reasonably become, fitted by education, training or experience." [emphasis added] (AR 391).

11. Plaintiff was suffering from a "Total Disability" under the terms of her policy/plan at the time that her benefits were terminated by CCC (June 2, 2003).

12. CCC wrongfully terminated Plaintiff Miller's benefits.

13. Under ERISA Plaintiff is entitled to "recover benefits due to h[er] under the terms of h[er] plan ..." 29 U.S.C. § 1132(a)(1)(B). Plaintiff's damages with respect to her benefits due are equal to the missed disability benefits over the period from June 2, 2003 until the present.

14. Plaintiff is also entitled to a declaration of her "rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). The Court has determined that Plaintiff was "Totally Disabled" when CCC wrongfully terminated her benefits on June 2, 2003. She is therefore entitled to benefits under her policy as determined by its terms.

15. Plaintiff also seeks an award of pre-judgment interest on the award pursuant to the Court's discretion under ERISA.

16. "Whether to award prejudgment interest to an ERISA plaintiff is 'a question of fairness, lying within the court's sound discretion, to be answered by balancing the equities." *Landwehr v. DuPree, 72 F.3d 726, 739* (9th Cir.1995)(quoting *Shaw v. International Ass'n of Machinists & Aerospace Workers Pension Plan, 750 F.2d 1458, 1465* (9th Cir.1985)). "Among the factors to be considered in determining whether prejudgment interest should be awarded is the presence or absence of 'bad faith or ill will.' " *Id.*

17. The Court makes an explicit finding of "bad faith or ill will" by Defendants in this case.[FN5] As such, the equities balance in favor of an award of prejudgment interest to Plaintiff.

> FN5. The Court finds that, Defendants (CCC and then Hartford) have placed their own interests above those of the insured. Even during this litigation, Defendant refused to follow the order of the Court to produce discovery and was ultimately held in contempt of court.

18. Plaintiff has been deprived of the value of the benefits to which she was entitled for the entire period from June 2, 2003 to the present. As such, CCC and Hartford (and not Plaintiff) have derived benefit from those funds (including interest), and Plaintiff has been forced to bring the present action to recover funds to which she was entitled. As the Supreme Court has often stated, "prejudgment interest 'is an element of [plaintiff's] complete compensation." *Osterneck v. Ernst & Whitney, 489 U.S. 169, 175, 109 S.Ct. 987, 103 L.Ed.2d 146 (1989)* (quoting *West Virginia v. United States, 479 U.S. 305, 310, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987)*). There is no evidence that an award of prejudgment interest would unduly burden Defendants, or their respective policy-holders. As such, the Court holds that such an award is appropriate.

**\*9** 19. Defendants having presented no reason to depart from this standard the amount of prejudgment interest will be determined by reference to the 52-week U.S. Treasury Bill rate paid for the period immediately prior to each unpaid benefit.[FN1] *See, e.g., Blanton v. Anzalone, 760 F.2d 989, 992-93 (9th Cir.1985)* (referencing *28 U.S.C. § 1961* and the rate set by the 52-week U.S. Treasury Bill rate); *Blanton v. Anzalone, 813 F.2d 1574, 1576 (9th Cir.1987)* (vacating and remanding for calculation of interest in accordance with 52-week U.S. Treasury Bill rate, rather than rate applied by district court, due to failure to articulate "substantial" reason); *see also 28 U.S.C. § 1961* (permitting judgment interest).

> FN1. Interest calculation shall comply with *28 U.S.C. § 1961*.

20. Finally, Plaintiff seeks attorneys' fees and costs pursuant to the Court's discretion under the ERISA statute. *See 29 U.S.C. § 1132(g)(1)* ("In any action ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs ...").

21. The Court considers: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions. *See, e.g., Cline v. The Industrial Maintenance Engineering & Contracting Co., 200 F.3d 1223, 1235-36 (9th Cir.2000)* (citing *Hummell v. S.E. Rykoff & Co., 634 F.2d 446, 453 (9th Cir.1980)*).

22. In applying these " *Hummell* factors," the Court must "keep at the forefront ERISA's remedial purposes that 'should be liberally construed in favor of protecting participants in employee benefit

plans.' " *McElwaine v. U.S. West, Inc., 176 F.3d 1167, 1172 (9th Cir.1999)* (citations omitted). "We also apply a 'special circumstances' rule in which a successful ERISA participant 'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *McElwaine,* 176 F.3d at 1172. "A plan participant who prevails in an action to enforce rights under the plan is ordinarily entitled to a reasonable attorney's fee if the participant 'succeed[s] on any significant issue in litigation which achieves some of the benefit ... sought in bringing suit' ..." *Barnes v. Indep. Auto. Dealers Assoc. of Cal. Health & Benefit Plan, 64 F.3d 1389, 1397 (9th Cir.1995)* (citations omitted).

23. In this case, the *Hummell* factors, "liberally construed" in light of the "remedial purposes" of the ERISA statute, weigh in favor of an award of attorneys' fees to Plaintiff. The Court finds sufficient evidence of "bad faith" by Defendants to satisfy the first factor, although "bad faith is not a prerequisite to an ERISA fee award." *McElwaine,* 176 F.3d at 1173 (citing *Smith v. CMTA-IAM Pension Trust, 746 F.2d 587, 590 (9th Cir.1984)*). There is no evidence of any inability to pay by Defendants, such that the second factor weighs in favor of an award. The third factor (deterrence) has significant application to this case, especially in light of Defendants' litigation behavior, which went above and beyond normal litigation tactics and resulted in Defendants being held in contempt for refusal to turn over documents after this Court upheld the Magistrate Judge's ruling that they be disclosed. To the extent that Defendants may be persuaded to more carefully consider future disability claims in light of the result in this case, this factor also weighs in favor of an award. The fourth factor has no obvious application to this case, but in light of the strength of the evidence submitted by Plaintiff and the favorable result achieved by Plaintiff; the fifth factor weighs heavily in favor of an award to Plaintiff of attorneys' fees and costs.

**\*10** 24. Plaintiff is clearly the "prevailing party" in the instant suit, and is therefore entitled to recovery of reasonable attorneys' fees and costs incurred in the litigation.

25. The amount of attorneys' fees and costs to be awarded will be determined on a separate motion therefor to be filed by Plaintiff in accordance with Fed. R. Civ. Pro. 54(d). Any award will be guided by the following principles:

a. This circuit has adopted the hybrid lodestar/multiplier approach used in *Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)* as the proper method for calculating attorneys' fees in ERISA cases. *See Van Gerwen v. Guarantee Mutual Life Co., 214 F.3d 1041, 1045 (9th Cir.2000)*.

b. ERISA attorneys' fees (29 U.S.C. § 1132(g)(1)) are typically limited to fees incurred in litigation; fees are not typically available for the administrative phase of the claims process. *See Cann v. Carpenters' Pension Trust Fund for Northern California, 989 F.2d 313, 315-17 (9th Cir.1993)* (construing statute).

c. There are no enhancement multipliers for contingency fees in ERISA cases. *See Cann,* 989 F.2d at 317-18.

26. Prior to filing any motion, counsel for Plaintiff and for Defendants should meet and confer on the amount of a total award, prejudgment interest thereon, and on reasonable attorneys' fees.

27. Any finding of fact which is deemed a conclusion of law is incorporated herein by reference.

### III. CONCLUSION

Upon *de novo* review, and a non-jury trial which supplemented the administrative record, this Court holds that Plaintiff Willow Rorabaugh suffers from a "total disability" under the terms of her ERISA plan with Defendant CCC. Defendant Hartford later assumed the obligations of CCC and made the final appeal decision denying Plaintiff benefits. Plaintiff is entitled to recover all past benefits missed since benefits were terminated on June 2, 2003, as well as prejudgment interest on those benefits. Furthermore, Plaintiff shall be entitled to continue to receive her benefits until those benefits should otherwise terminate under the terms of the plan. In addition, this Court finds Plaintiff to be a prevailing party, and thereby entitled to reasonable attorneys' fees and costs, to be determined by

separate motion. Finally, the parties are hereby ORDERED to meet and confer regarding the amount of past due benefits and interest, and to SUBMIT to this Court, no later than two weeks after entry of this order, a summary of the calculation of the total award. This shall be in the form of a [Proposed] Final Judgment. The parties are further ORDERED to meet and confer prior to the timely filing of a motion by Plaintiff to determine the amount of attorneys' fees and costs.

C.D.Cal.,2006.
Rorabaugh v. Continental Cas. Co.
Not Reported in F.Supp.2d, 2006 WL 4384712 (C.D.Cal.)

Motions, Pleadings and Filings (Back to top)

• 2007 WL 912150 (Verdict and Settlement Summary) (Jan. 26, 2007)
• 2:05cv03612 (Docket) (May 13, 2005)

Judges, Attorneys and Experts (Back to top)

Judges | Attorneys | Experts

Judges

• **Collins, Hon. Audrey B.**
United States District Court, Central California
California
Litigation History Report | Judicial Motion Report | Judicial Reversal Report | Judicial Expert Challenge Report | Profiler

Attorneys

Attorneys for Defendant
• **Keehn, Robert F.**
Los Angeles, California
Litigation History Report | Profiler

Attorneys for Plaintiff
• **Chandler, Corinne**
Northridge, California
Litigation History Report | Profiler

• **Kantor, Glenn R. Esq.**
Northridge, California
Litigation History Report | Profiler

Experts

• **Marks, Robert Lewis**
PHYSICIAN AND SURGEON
La Mesa, CA
Expert Evaluator Report | Expert Challenge Report | Expert Testimony | Profiler

END OF DOCUMENT

(c) 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

# BMC Public Health



Research article

**Open Access**

# Evidence-based guidelines in the evaluation of work disability: an international survey and a comparison of quality of development

Wout EL de Boer*[1], David J Bruinvels[2], Arie M Rijkenberg[3,4], Peter Donceel[5] and Johannes R Anema[2]

Address: [1]Department of Quality of Life, TNO, Hoofddorp, the Netherlands, [2]Department of Public and Occupational Health and EMGO-Institute, Amsterdam, the Netherlands, [3]Department of Quality of Life, TNO, Hoofddorp, the Netherlands, [4]Occup. Med. Service, OCMW-Antwerpen, Antwerp, Belgium and [5]Section of Occupational, Environmental and Insurance Medicine, Department of Public Health, Katholieke Universiteit Leuven, Leuven, Belgium

Email: Wout EL de Boer* - wout.deboer@tno.nl; David J Bruinvels - d.bruinvels@vumc.nl; Arie M Rijkenberg - A_M_Rijkenberg@lycos.at; Peter Donceel - peter.donceel@med.kuleuven.be; Johannes R Anema - h.anema@vumc.nl

* Corresponding author

Published: 18 September 2009

*BMC Public Health* 2009, 9:349   doi:10.1186/1471-2458-9-349

This article is available from: http://www.biomedcentral.com/1471-2458/9/349

Received: 31 May 2009
Accepted: 18 September 2009

© 2009 de Boer et al; licensee BioMed Central Ltd.
This is an Open Access article distributed under the terms of the Creative Commons Attribution License (http://creativecommons.org/licenses/by/2.0), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited.

## Abstract

**Background:** In social insurance, the evaluation of work disability is becoming stricter as priority is given to the resumption of work, which calls for a guarantee of quality for these evaluations. Evidence-based guidelines have become a major instrument in the quality control of health care, and the quality of these guidelines' development can be assessed using the AGREE instrument. In social insurance medicine, such guidelines are relatively new. We were interested to know what guidelines have been developed to support the medical evaluation of work disability and the quality of these guidelines.

**Methods:** Five European countries that were reported to use guidelines were approached, using a recent inventory of evaluations of work disability in Europe. We focused on guidelines that are disease-oriented and formally prescribed in social insurance medicine. Using the AGREE instrument, these guidelines were appraised by two researchers. We asked two experts involved in guideline development to indicate if they agreed with our results and to provide explanations for insufficient scores.

**Results:** We found six German and sixteen Dutch sets of disease-oriented guidelines in official use. The AGREE instrument was applicable, requiring minor adaptations. The appraisers reached consensus on all items. Each guideline scored well on 'scope and purpose' and 'clarity and presentation'. The guidelines scored moderately on 'stakeholder involvement' in the Netherlands, but insufficiently in Germany, due mainly to the limited involvement of patients' representatives in this country. All guidelines had low scores on 'rigour of development', which was due partly to a lack of documentation and of existing evidence. 'Editorial independence' and 'applicability' had low scores in both countries as a result of how the production was organised.

**Conclusion:** Disease-oriented guidelines in social insurance medicine for the evaluation of work disability are a recent phenomenon, so far restricted to Germany and the Netherlands. The AGREE instrument is suitably applicable to assess the quality of guideline development in social insurance medicine, but some of the scoring rules need to be adapted to the context of social insurance. Existing guidelines do not meet the AGREE criteria to a sufficient level. The way patients' representatives can be involved needs further discussion. The guidelines would profit from more specific recommendations and, for providing evidence, more research is needed on the functional capacity of people with disabilities.

*BMC Public Health* 2009, 9:349                                  http://www.biomedcentral.com/1471-2458/9/349

## Background

In the western world, work disability is a problem at the individual, company, and societal levels. Western countries spend about 1.2% of GDP on work disability benefits or 2% if sickness benefits are included, which, for most countries, is an increase over the past 15 years. The probability of returning to work after being granted a long-term disability benefit is below 2% annually on average. Work disability is the end of their working life for the vast majority of recipients [1]. To reduce work disability, many countries have restricted access to disability benefits in social insurance and they have developed programmes to promote return to work [2-4]. In the Netherlands, eligibility criteria have become stricter with the implementation of a new law on long-term work disability. In the United Kingdom, a renewal of the personal capacity assessment for long-term disability benefit was recently implemented [5] and comparable changes are occurring in other countries [2-4]. These policy changes are meant to result in more people being active in work and fewer people receiving disability benefits. In disability benefit systems, social insurance physicians (SIPs) evaluate claims for entitlement to long-term disability benefits [6]. These work disability evaluations are traditionally based mainly on legislation, administrative rules, and doctors' expertise.

When resources are tight, it becomes even more important to determine in a valid and scientifically sound way who is and is not entitled to disability benefit. Internationally, the medical evaluations of work disability turn out to be relatively comparable while being part of social insurance systems that vary strongly [6-8]. The quality of these evaluations is not easy to establish, as no gold standard exists for their validity [9,10]. The mechanism used most often to ensure quality is to organise the process of evaluation in such a way that an optimal result can be expected. A common practice in 14 countries, in Europe and the Russian Federation, is to use qualified doctors, the SIPs, and to have medical reports verified by staff doctors [6]. Although instruments used to support medical decision making are not validated for this purpose [6,9,11], this does not necessarily mean that they are unsuitable.

One way of ensuring the quality of medical work is to use evidence-based guidelines [12], which is common in clinical practice [13]. In clinical practice, guidelines, which the clinician can use with his clinical experience and the patient's preferences, are intended to support the physician by providing recommendations for diagnosis, treatment, and prognosis. [14]. Evidence-based clinical practice means using the best evidence available, in consultation with the patient, to decide on the option that suits that patient best [15]. Guidelines, however, are not restricted to clinical practice: some are being introduced on a wider scale in occupational medicine [16,17] and

serve, among other functions, to support the coaching of employees with work-related health problems [18,19]. In occupational medicine, guidelines are intended to provide an occupational physician with recommendations for diagnosis and prognosis of the work-related problem and for the selection of effective interventions [17]. These guidelines can be used in addition to the experience of the occupational health professional and the preferences of the employee and employer. However, guidelines for evaluation in social insurance medicine are a rather new phenomenon.

Having guidelines for medical work does not necessarily mean that the quality of the work is supported. Guidelines need to be adequate for the process they are to support and they need to be used in practice. The Appraisal of Guidelines Research & Evaluation (AGREE) collaboration developed the AGREE instrument to assess the quality of clinical practice guidelines [20] and to establish the quality of the development of guidelines with regard to scientific principles. The AGREE instrument is composed of twenty-three items covering six domains of quality of guideline development: 'scope and purpose', 'involvement of stakeholders', 'rigour of development', 'clarity and presentation of recommendations', 'applicability', and 'editorial independence'. The AGREE instrument has been tested in clinical guidelines and was found to have a good reliability [21]. Thus far, there are no universally accepted cut-off points to identify high-quality guidelines [22]. A high-quality guideline can be expected to contribute to high-quality recommendations but does not warrant them as the evidence used is in general limited and controversial [23,24]. The AGREE instrument is widely used to evaluate clinical guidelines [25,26], as well as those found in occupational medicine [16,27,28], but so far has not been used in social insurance medicine. Social insurance medicine may simply be lagging behind, but the AGREE instrument may not be being used in social insurance medicine because of the rather different medical work involved in social insurance.

Medical practice in social insurance evaluations is different from clinical medical practice in several ways [29,30]. In clinical practice, the consultation is a private initiative of a patient who seeks help that is often restricted by policies of health insurance, whereas in social insurance medicine the consultation is an evaluation that is determined by the legal context and the constraints that the implementing body, the Institution of Social Insurance (ISI), puts on it. In clinical practice, the focus is on disease and finding a cure, whereas in social insurance medicine the focus is on capacity for, and a return to, work. In clinical practice, a patient's request for treatment is taken for granted; in social insurance medicine, the claim to be exempt from work and for a benefit to be paid is scruti-

*BMC Public Health* 2009, 9:349

nised and evaluated. The position of the claimant in a social insurance context is therefore different from the position of the patient in a clinical care context, differences that have been found to influence the practice of the evaluations [31]. Furthermore, the position of social insurance physicians is different from doctors in clinical medicine as the SIPs have an advisory function towards the ISI they work for and not primarily for the claimant [6]. This position may give rise to tensions between administrative procedures for handling big numbers of claimants and the doctors' need to deliver tailor-made evaluations [32,33].

It is difficult to diagnose the functional consequences of diseases in general and even more so for non-specific diseases such as lower back pain, chronic fatigue, and stress-related disorders. The association between a medical diagnosis and the functional limitations that may lead to work disability is weak and influenced by environmental and personal characteristics, as described in the International Classification of Functioning and Health (ICF) model [34]. From a legal standpoint, evaluations of work disability become more difficult due to stricter eligibility criteria with respect to objectivity, diagnosis, and prognosis of the disability. Sound support from evidence-based guidelines would, therefore, be welcome. The European Union of Medicine in Assurance and Social Security (EUMASS), a network of insurance medicine associations in seventeen European countries, recently published a comparison of work disability evaluation practices and the instruments in use, including guidelines [8]. This comparison was produced by several questionnaire rounds among central medical staff of participating countries. Two central questions in that study were

1. What is evaluated in your countries' work disability evaluation?

2. What instruments are used for these evaluations?

We were interested to determine what guidelines exist in different countries and their quality by focusing on the following research questions:

1. What *disease-oriented* guidelines have been developed to support the medical evaluation of work disability?

2. What is the quality of these guidelines in social insurance medicine?

## Methods
### I. Identification of disease-oriented guidelines to evaluate work disability
We used the EUMASS table to determine the countries in which guidelines were reported to be in use. The Nether-

lands, the Czech Republic, Germany, the United Kingdom, and Switzerland were visited based on their reported use of the guidelines; no other countries had reported using guidelines for medical evaluations. The status of guidelines was assessed during the visits by determining if they were officially prescribed. Copies of the guidelines with explanation were collected. For this article we focused on the guidelines for evaluating work disability by SIPs that were prescribed by law or as an instruction by the ISI. We distinguished between disease-oriented guidelines (describing aspects of evaluations for certain pathologies) and process-oriented guidelines (describing aspects of evaluations, regardless of pathology), a distinction that is evident from the relative guideline's title. We selected disease-oriented guidelines. To compare guidelines, we selected those that addressed the same diseases.

### 2. Quality appraisal of guidelines
The selected guidelines were scored using the AGREE instrument, which uses 4-point scales for each item: scope and purpose (3 items), stakeholder involvement (4 items), rigour of development (7 items), clarity and presentation of the recommendations (4 items), applicability of the guideline (3 items), and editorial independence (2 items). To correct for the different number of items in each domain, The AGREE instruments suggests calculating domain scores by relating the obtained scores (OS) to the maximum possible score (MaPS) and the minimum possible score (MiPS) using the formula

$$OS\text{-}MiPS / MaPS\text{-}MiPS$$

As a test, one (Dutch) guideline (burnout) was scored by two researchers (WdB and DB) using the AGREE instrument and its user guide to establish if additional rules for scoring would be required. The test showed the need for additional scoring rules. We specified the clinical question and the target population and we adapted user guide item 11 (health benefits, side effects and risks) and 16 (options for management of the condition) [see Additional File 1]. The selected guidelines were then scored independently by two researchers (WdB and DB). The initial agreement between the researchers was determined using Kappa. Any differences were discussed, but if a difference remained, a decisive third researcher (JRA) would score as well, using the scores and arguments of the first two. We analysed the initial correlation between the two scoring researchers. As this use of the AGREE instrument is new in social insurance medicine, we asked one expert in each country who had participated in developing several guidelines for a reaction to our results: "Are these correct in your view and what is your explanation for any insufficient scores?"

BMC Public Health 2009, 9:349

http://www.biomedcentral.com/1471-2458/9/349

### Ethics committee

This study was not submitted for ethical approval. The study included physicians who were not asked to perform specific professional actions for this study, but only to complete a questionnaire. All studied documents are in the public domain.

## Results

### I. Identification of disease-oriented guidelines to evaluate work disability

In Germany seven guidelines for SIPs turned out to be officially in use. In the Netherlands twenty-four were found and one in Switzerland. These guidelines are partly process-oriented and partly disease-oriented. Process guidelines were used in Germany (1), the Netherlands (8), and Switzerland (1). The German and Swiss guidelines each contain many recommendations that in the Netherlands are distributed over eight smaller guidelines. The recommendations refer, for example, to the relevance of the diagnosis for the evaluation and to the boundaries of the concept of disease. Another topic of these guidelines is the claimant's obligation to attempt to recover and find gainful employment. Yet another aspect is the relevance of distinguishing between the opinions of the claimant and the SIP. These recommendations represent the consensus of legal and medical experts on the principles of evaluation, but not on scientific evidence. These process-oriented guidelines were excluded.

Disease-oriented guidelines were in use in Germany (6) and the Netherlands (16), shown in Table 1. In the Czech Republic, a Barema-type of guideline is in official use, but this was excluded from this study as it evaluates impairments, not work disability.

The Dutch guidelines, all implemented by law, were first developed by the Health Council of the Netherlands and later by the scientific association of SIPs (NVVG). The German guidelines were developed and prescribed by the German Institution of Social Insurance (DRV). The German guidelines were developed earlier than the Dutch and most have been updated since their inception.

### 2a. The appraisal of quality with the AGREE instrument of selected guidelines

Of the guidelines, four diseases were common to both countries: breast cancer, chronic obstructive lung disease, lumbar intervertebral disc herniation, and myocardial infarction.

The initial agreement between researchers was high for the Dutch guidelines (Kappa range 0.814-0.939), but low for the German counterparts (Kappa range 0.449-0.624). After discussing the different opinions of the researchers, agreement was reached on all items and scoring by the third researcher was unnecessary. The results are presented in Table 2.

*The scope and purpose of the guideline* were well described in all eight guidelines; the score in both countries was 100%. All guidelines were designed to support the medical evaluation of work disability by indicating what functional incapacities were to be expected in cases with a specific diagnosis.

*Stakeholder involvement* was 52% for the Dutch and 33% for the German guidelines. Potential users were well defined (social insurance physicians), but the involvement of professional groups was found to be incomplete in seven of the eight guidelines. The patients' views were not sought in the German guidelines and only at the final stage in the Dutch. No guidelines were piloted among end-users before their publication.

*Rigour of development* was 16% with the Dutch and 23% with the German guidelines. How evidence was gathered and the scientific grounding of recommendations were not explicit in any guideline.

*Clarity and presentation* of the guidelines was 63% for the Dutch guidelines and 71% for the German. Although the recommendations were unambiguous and easily identifiable in almost all cases, they were not overly specific. Different options for assessing the condition of the guidelines were often mentioned, and the German guidelines provided tools for the evaluations.

*Applicability* scored 6% in the Netherlands and 8% in Germany. Practical barriers and costs were not addressed in any guideline. The German guidelines contained indications of when to update them.

*Editorial independence* was limited in both countries. The Dutch guidelines reached 50% on average as they were developed independently of the funding body, but with only a general procedure about conflicting interests. The German guidelines (0%) were developed entirely within the ISI and conflicting interests were not addressed.

### 2b Feedback on the AGREE scores by experts involved in developing several guidelines

The Dutch expert was involved in developing 11 of 16 then-published guidelines in the Netherlands and 3 of the 4 protocols that we scored on the AGREE instrument. He agreed to all our scoring after we discussed our scoring rules with him. He attributed low scores to the newness of creating guidelines for social insurance medicine in the Netherlands and that the short time allotted to create them was a factor. Stakeholder involvement was also reduced because patients' involvement was controversial

*BMC Public Health* 2009, 9:349

http://www.biomedcentral.com/1471-2458/9/349

**Table 1: Diagnosis-oriented guidelines for SIPs to country, publisher, and year of publication/revision, nr of pages (exc summary and addenda) and nr of references.**

| Guideline (country and publisher) | Year | Pages | References |
|---|---|---|---|
| Aspecific Lumbar Disorder (NL, Health Council) | 2005/2008 | 20 | 15 |
| Myocardial Infarction (NL, Health Council) | 2005/2008 | 22 | 45 |
| Anxiety Disorders (NL, Health Council) | 2007 | 30 | 27 |
| Stroke (NL, Health Council) | 2007 | 30 | 30 |
| Breast Cancer (NL, Health Council) | 2007 | 24 | 35 |
| Chronic Fatigue Syndrome (NL, Health Council) | 2007 | 26 | 22 |
| Herniating Intervertebral Disc (NL, Health Council) | 2007 | 20 | 14 |
| Burnout (NL, Health Council) | 2007 | 28 | 29 |
| Depressive Disorder (NL, Health Council) | 2007 | 32 | 29 |
| Whiplash Associated Disorders (NL, Health Council) | 2008 | 26 | 24 |
| Arthritis Hip and Knee (NL, NVVG) | 2007 | 28 | 56 |
| Rheumatoid Arthritis (NL, NVVG) | 2007 | 34 | 57 |
| Chronic Obstructive Lung Disease (NL, NVVG) | 2007 | 46 | 54 |
| Chronic Heart Failure (NL, NVVG) | 2007 | 30 | 41 |
| Schizophrenia and associated psychoses (NVVG) | 2007 | 50 | 135 |
| Chronic Shoulder Disorders (NL, NVVG) | 2007 | 21 | 37 |
| Mental disorders (DE, DRV) | 2001/2006 | 53 | 59 |
| Herniating Intervertebral Disc (DE, DRV) | 2002/2003/2005 | 26 | 28 |
| Chronic Inflammatory Bowel Disease (DE, DRV) | 2005 | 26 | 60 |
| Coronary Heart Disease (DE, DRV) | 2001/2005 | 20 | 54 |
| Chronic Obstructive Lung Disease (DE, DRV) | 2003/2005 | 34 | 47 |
| Breast Cancer (DE, DRV) | 2006 | 22 | 42 |

in the beginning as there was concern about patients being biased with regard to the recommendations. The low figure on rigour of development was because the methods of development had not been recorded and because the field had no scientific tradition. The lack of specificity of the recommendations was due mainly to a lack of existing scientific research. Applicability scored low in the Netherlands as the guidelines were developed by the Health Council, for whom this was not a regular activity. The aspects of applicability were considered by the ISI after publication of the guidelines.

BMC Public Health 2009, 9:349    http://www.biomedcentral.com/1471-2458/9/349

Table 2: AGREE scores of selected guidelines to domain

| | Breast Cancer | | Chronic Obstructive Lung Disease | | Lumbar Intervertebral Disc Herniation | | Myocardial Infarction | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Dutch | German | Dutch | German | Dutch | German | Dutch | German | Dutch | German |
| *Scope and purpose of the guideline* | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 |
| *Stakeholder involvement* | 58 | 33 | 50 | 33 | 50 | 33 | 50 | 33 | 52 | 33 |
| *Rigour of development* | 10 | 19 | 19 | 24 | 19 | 19 | 14 | 29 | 16 | 23 |
| *Clarity and presentation* | 75 | 67 | 75 | 67 | 50 | 75 | 50 | 75 | 63 | 71 |
| *Applicability* | 11 | 0 | 11 | 33 | 0 | 0 | 0 | 0 | 6 | 8 |
| *Editorial independence* | 50 | 0 | 50 | 0 | 50 | 0 | 50 | 0 | 50 | 0 |

The German expert was involved in developing five of six guidelines published at the time in Germany and in all the guidelines we scored on the AGREE instrument. He agreed to nineteen of the twenty-three scores after we discussed our scoring rules with him. Differences were due partly to how the German guidelines were described (experts involved were not identified with their specialisation) and to differences in the interpretation of items 13, 14, and 15. He commented that the development of guidelines was new in Germany and started from a need of the SIPs within the ISI, which explained the limited involvement of stakeholders. The involvement of patients' representatives was considered unhelpful because of expected bias. Testing among users was done implicitly as the guidelines were developed at the institution where the SIPs work. The selection of evidence and formulation of recommendations were carried out according to what the German experts considered the most important. No need had existed to document any more than they did for internal use, which accounted for the low score on the rigour of the guidelines' development. This internal development also accounted for the low score on applicability; this was included implicitly within the development process of internal guidelines. Editorial independence was not considered important, as the interests of the SIPs and the ISI were not supposed to conflict.

## Discussion

In this study we looked for the existence of evidence-based guidelines for the medical evaluation of long-term work disability and the quality of development of these guidelines.

### Main findings

Using the EUMASS comparison, we found guidelines for the medical evaluation of work disability, both disease- and process-oriented, in official use in four of seventeen European countries. In two of these countries we found twenty-two disease-oriented guidelines in official use in these evaluations. The AGREE instrument was applicable for scoring the selected Dutch and German guidelines, although minor adaptations to the AGREE instrument were necessary. Scoring German guidelines gave a smaller initial agreement than the Dutch, due to language problems and understanding of the German social insurance; however, the consensus procedure compensated for these issues. The guidelines scored well on 'scope and purpose' and 'clarity and presentation', and moderately on 'stakeholder involvement' in the Netherlands, but low in Germany; all guidelines scored low on 'rigour of development'. 'Editorial independence' and 'applicability' were low as a result of how production was organised.

### Strengths and weaknesses

To our knowledge, this is the first study to identify and qualify medical guidelines in social insurance medicine at an international level. As we were looking for official guidelines, we do not believe that we missed any in the countries we included; however, focusing on official guidelines may have resulted in finding fewer guidelines than are in practical use. For example, in Germany and Switzerland, guidelines are published by specialists in scientific journals. These are not in official use, but they may support physicians in their evaluations.

*BMC Public Health* 2009, 9:349                     http://www.biomedcentral.com/1471-2458/9/349

We used the AGREE instrument to determine the quality of the guidelines, which recommends using four appraisers for a good reliability [20]. Using a pilot procedure and two researchers for scoring, we obtained good agreement, which was supported by the opinion of the two experts who were involved in developing the guidelines. All items of the AGREE instrument proved to be relevant for testing the guidelines. We did not encounter important aspects that were not addressed by the AGREE instrument; further validation is needed however. Our adaptations are partly specifications of the scope of the AGREE instrument to the context of social insurance medicine, but are unlikely to influence the integrity of the AGREE instrument. Our adaptations of items 11 and 16 are less clear-cut translations that need to be tested.

### Other studies

Our study corresponds with other research; the distinction between legal and medical guidelines fits with the results of Boer et al. [35] about the medical and legal aspects of a doctor's reasoning. The reliability of the AGREE instrument outside the clinical domain [16,27,28] was partly confirmed in our study, after minor alterations were made. Finding that guidelines do not fully meet the AGREE criteria is not uncommon [22,36-38], partly due to the lack of a precise account of the development process and partly because of a lack of scientific evidence; both are not uncommon problems in drafting guidelines [22,39,40]. The relative lack of scientific research on the work participation of people with chronic diseases is also well documented [40-43].

### Impact

We found disease-oriented guidelines in only two participating countries, and there they are recent. Work disability is being evaluated on similar aspects in many countries, despite large differences in organisation of social insurance [6]; thus, we expect the development of guidelines to be likely elsewhere. Our results may be helpful in facilitating this.

Our comparison of development quality is based on four Dutch and four German guidelines, on four different pathologies. The German and Dutch social insurance systems differ in many aspects, but both require a medical statement about functional capacity in cases of claims for work disability benefit. From this perspective the guidelines are comparable in and between countries. As the guidelines in these countries have been created in a similar fashion, we expect our results to be relevant to future disease-oriented guideline development in these countries.

We used the AGREE instrument as a tool for evaluating the quality of guideline development in social insurance

medicine, a procedure that, to our knowledge, is new. It is unclear if using the AGREE instrument in a different domain is without problems; however, neither we, nor the experts we consulted, noticed any clear incongruence. The AGREE instrument is now being utilised in both Germany and the Netherlands.

With the AGREE instrument the quality of the development of guidelines can be scored, which is not the same as the quality of the recommendations. It is possible that the guidelines contain adequate recommendations that have been developed in a suboptimal way or whose development has been accounted for in a suboptimal way. Good practice, however, is best supported by guidelines that have been developed in a proven, optimal way. Several aspects need further consideration. The involvement of patients' representatives is now accepted in the Netherlands, after much discussion about the nature of their input; in Germany, however, this is not the case. This difference illustrates the ambiguity of the claimant's position in social insurance medicine: he is both passive object of the evaluation and participating subject in work disability. AGREE criteria are clear, however: participation of patients' representatives is mandatory. The development of the guidelines in the Netherlands has now been placed under the authority of the scientific association of SIPs, as this is viewed as the best way to retain independence from both the funding and implementing bodies. In Germany, financing, developing, and implementing within the ISI is considered effective, which illustrates the ambiguity of the profession of social insurance medicine as a discipline that needs to stress its independence and quality and a group of doctors working for administrative organisms with more interests than medical quality [29,33]. AGREE criteria are clear on this aspect, too: a good guideline needs to be developed independently.

The inclusion of disease-oriented research into the practice of disability evaluation will help coordinate clinical, occupational, and social insurance medicine, in using the same concepts and findings, although in different spheres. The lack of scientific evidence may be compensated for, in part, by research on the aspects that influence disability with chronic conditions in general [41,43]. Parallel to this, research needs to be commenced to establish if the guidelines actually contribute to quality improvement. Finally, the production of these guidelines will help formulate the questions that need to be addressed in future research to ground social insurance evaluations.

We expect that the diffusion of our results may aid further development of guidelines in social insurance medicine and, notably, help these become increasingly more evidence-based, which would assist in establishing a new and important mechanism for quality control in social

BMC Public Health 2009, 9:349                                    http://www.biomedcentral.com/1471-2458/9/349

insurance medicine. Paraphrasing Lohr [15], evidence-based evaluation practice in social insurance medicine would mean using the best evidence available and the best procedure possible to decide on the option that suits that claimant best.

## Conclusion

Evidence-based guidelines form an important instrument for enhancing the quality of medical practice. Guidelines can provide a framework on which a clinician can ground diagnosis, therapy, and prognosis. Guidelines in social insurance medicine for the evaluation of work disability are a recent phenomenon, so far restricted to Germany and the Netherlands. We expect that disease-oriented guidelines can be useful in other countries as well, and can help the SIP ground his evaluation of capacity for work. For the practice of evaluating work disability, this would mean an important instrument to control quality. The AGREE instrument is suitably applicable for assessing the quality of guideline development in social insurance; nevertheless, some of the scoring rules need to be adapted to the context of social insurance. Existing guidelines do not meet AGREE criteria sufficiently. Notably, how patients' representatives can be involved and the editorial independence of the guideline developers need further discussion. The guidelines would profit from more specific recommendations and, for this, more research is needed on the functional capacity of people with disabilities. To date, research has focused primarily on the recovery from complaints, while mainly ignoring the resumption of work. The latter depends on much more than a health condition, but still, the challenge of health care should not only be to give relief for pain and suffering, but also to allow participation in society and to legitimise a disability benefit if needed for medical reasons.

## Competing interests

The authors declare that they have no competing interests.

## Authors' contributions

WB designed the study, carried out the field work, and prepared the manuscript. DB participated in the scoring and drafting of the article. AR participated in the field work. PD supervised the field work and participated in drafting the article. HA supervised and participated in the drafting of the article. All authors read and approved the final manuscript.

## Additional material

**Additional file 1**
*AGREE from clinic to social insurance. this document describes the way in which AGREE criteria were used in the study of guidelines in social insurance.*
Click here for file
[http://www.biomedcentral.com/content/supplementary/1471-2458-9-349-S1.DOC]

## Acknowledgements

The study was supported with a grant from the SIG Foundation, which had no involvement in the study itself or in the decision to submit the paper for publication. The authors wish to express their gratitude to Dr. Klaus Timner, MD, and Mr. Frans Westerbos, MD, who commented on the authors' scoring and interpretation of these scores.

## References

1.  Organisation for Economic Co-operation and Development (OECD): **Sickness, disability and work: keeping on track in the economic downturn.** In *Background paper* Paris OECD; 2009.
2.  Organisation for Economic Co-operation and Development (OECD): **Sickness, Disability and Work: Norway, Poland and Switzerland.** *Volume 1.* Paris OECD; 2006.
3.  Organisation for Economic Co-operation and Development (OECD): **Sickness, Disability and Work: Australia, Luxembourg, Spain and the United Kingdom.** *Volume 2.* Paris OECD; 2007.
4.  Organisation for Economic Co-operation and Development (OECD): **Sickness, Disability and Work: Denmark, Finland, Ireland and the Netherlands.** *Volume 3.* Paris OECD; 2008.
5.  Henderson M: **Transformation of the personal capability assessment.** Department of Work and Pensions. London; 2006.
6.  Boer WEL, de Besseling JJM, Willems JHBM: **Organisation of disability evaluation in 15 countries.** *Pratiques et organisation des soins* 2007, **38:**205-217.
7.  Council of Europe: **Assessing disability in Europe.** *Council of Europe Strasbourg* 2002.
8.  **Assessment of long term incapacity for work in European countries** [http://www.eumass.com/media/taxonomy.pdf]. visited 5-9-2009
9.  Wind H: **Assessment of physical work ability: the utility of functional capacity evaluation for insurance physicians.** In *PhD thesis* Amsterdam Amsterdam University; 2007.
10. Überschär, 2008: **Quality assurance in the socio-medical assessment in the German Pension Insurance. [in German].** *Gesundheitswesen* 2008, **70:**690-695.
11. Verbeek JHAM, Van Dijk FJH: **Assessing the ability to work.** *BMJ* 2008, **336:**519-520.
12. Burgers JS, Cluzeau FA, Hanna SE, Hunt C, Grol R: **Characteristics of high-quality guidelines: evaluation of 86 clinical guidelines developed in ten European countries and Canada.** *Int J Technol Assess Health Care* 2003, **19:**148-57.
13. **National Institute for Health and Clinical Excellence** [http://www.nice.org.uk/]. visited 5-9-2009
14. Sackett DL, Rosenberg WMC, Gray JAM, Haynes RB, Richardson WS: **Evidence based medicine: what it is and what it isn't.** *BMJ* 1996, **312:**71-72.
15. Lohr KN: **The quality of practice guidelines and the quality of health care.** In *Guidelines in health care: report of a WHO conference* Edited by: Selbmann HK. Baden Baden Nomos Verlaggesellschaft; 1998:42-52.
16. Cates JR, Young DN, Bowerman DS, Porter RC: **An independent AGREE evaluation of the Occupational Medicine Practice Guidelines.** *Spine* 2006, **6:**72-77.
17. Schaafsma F, Hugenholtz N, de Boer A, Smits P, Hulshof C, van Dijk F: **Enhancing evidence-based advice of occupational physicians.** *Scand J Work Environ Health* 2007, **33:**368-378.

*BMC Public Health* 2009, 9:349

18. Welde WE, Jos van der, Verbeek HAM, van Dijk FJH: **Relation between indicators for quality of occupational rehabilitation of employees with low back pain.** *Occup Environ Med* 1999, **56:**488-493.

19. Nieuwenhulzen K, Verbeek JH, Siemerink JC, Tummers-Nijsen D: **Quality of rehabilitation among workers with adjustment disorders according to practice guidelines: a retrospective cohort study.** *Occ Env Med* 2003, **60(suppl 1):**i21-i25.

20. AGREE collaboration: **Appraisal of Guidelines for Research & Evaluation.** 2001 [http://www.agreecollaboration.org/]. visited 5-9-2009

21. AGREE Collaboration: **Development and validation of an international appraisal instrument for assessing the quality of clinical practice guidelines: the AGREE project.** *Qual Saf Health Care* 2003, **12:**18-23.

22. Muth C, Gensichen J, Beyer M, Hutchinson A, Gerlach FM: **The systematic guideline review: method, rationale and test on chronic heart failure.** *BMC Health Services Research* 2009, **9:**74.

23. Burgers JS, Bally JV', Klazinga NS, Bij AK Van der, Grol R, Feder G: **Inside guidelines: Comparative analysis of recommendations and evidence in diabetes guidelines from 13 countries.** *Diabetes Care* 2002, **25:**1933-1939.

24. Burgers JS: **Guideline quality and guideline content: are they related?** *Clin Chem* 2006, **52:**3-4.

25. Appleyard TL, Mann CH, Khan KS: **Guidelines for the management of pelvic pain associated with endometriosis: a systematic appraisal of their quality.** *BJOG* 2006, **113:**749-57.

26. Nagy E, Watine J, Bunting PS, Onody R, Oosterhuis WP, Rogic D, Sandberg S, Boda K, Horvath AR, IFCC Task Force on the Global Campaign for Diabetes Mellitus: **Do guidelines for the diagnosis and monitoring of diabetes mellitus fulfil the criteria of evidence-based guideline development?** *Clin Chem* 2008, **54:**1872-82.

27. Hulshof C, Hoenen J: **Evidence based practice guidelines in OHS: are they agreeable?** *Ind Health* 2007, **45:**26-31.

28. Manchikanti L, Singh V, Helm S II, Trescot AM, Hirsch JA: **A critical appraisal of 2007 American College of Occupational and Environmental Medicine (ACOEM) Practice Guidelines for Interventional Pain Management: an independent review utilizing AGREE, AMA, IOM, and other criteria.** *Pain Physician* 2008, **11(3):**291-310.

29. Waddell G, Aylward M: **The scientific and conceptual basis of incapacity benefits.** Norwich: The Stationary Officer; 2005.

30. Aylward M: **Origins, practice and limitations of disability assessment medicine.** In *Malingering and illness deception* Edited by: Halligan PW, Bass C, Oakly DA. London: OUP; 2003:287-299.

31. de Boer WEL, Wind H, van Dijk FJH, Willems JHBM: **Interviews for the assessment of long-term incapacity for work: a study on adherence to protocols and principles.** *BMC Public Health* 2009, **9:**169.

32. Lipsky M: **Street level bureaucracy.** New York: Russell Sage; 1980.

33. Berendsen L: **Bureaucratic dramas.** In *PhD Thesis [In Dutch]* Tilburg University. Tilburg; 2007.

34. World Health Organisation (WHO): **International Classification of Functioning, Disability and Health (ICF).** Geneva: WHO; 2001.

35. de Boer WEL, Brage S, Donceel P, Rus M, Willems JHBM: **Medico-legal reasoning.** *BMC Public Health* 2008, **8:**335.

36. Tulder MW, van Tuut M, Pennick V, Bombardier C, Assendelft WJ: **Quality of primary care guidelines for acute low back pain.** *Spine* 2004, **29:**E357-62.

37. Boluyt N, Lincke CR, Offringa M: **Quality of evidence-based pediatric guidelines.** *Pediatrics* 2005, **115:**1378-91.

38. Poitras S, Avouac J, Rossignol M, Avouac B, Cedraschi C, Nordin M, Rousseaux C, Rozenberg S, Savarieau B, Thoumie P, Valat JP, Vignon E, Hilliquin P: **A critical appraisal of guidelines for the management of knee osteoarthritis using Appraisal of Guidelines Research and Evaluation criteria.** *Arthritis Res Ther* 2007, **9:**R126.

39. Ketola E, Kaila M, Honkanen M: **Guidelines in context of evidence.** *Qual Saf Health Care* 2007, **16(4):**308-12.

40. Slebus FG, Kuijer P Paul FM, Willems J (Han) HBM, Frings-Dresen Monique HW, Sluiter Judith K: **Work ability in sick-listed patients with major depressive disorder.** *Occ Med* 2008, **58(7):**475-47941.

41. Dekkers-Sánchez PM, Hoving JL, Sluiter JK, Frings-Dresen MHW: **Factors associated with long-term sick leave in sick-listed employees: a systematic review.** *Occup Environ Med* 2008, **65:**153-157.

42. Oxman AD, Schünemann HJ, Fretheim A: **Improving the use of research evidence in guideline development: 16. Evaluation.** *Health Res Policy Syst* 2006, **8(4):**28.

43. Slebus FG, Kuijer PPFM, Willems J (Han) HBM, Sluiter JK, Frings-Dresen MHW: **Prognostic factors for work ability in sicklisted employees with chronic diseases.** *Occup Environ Med* 2007, **64:**814-819.

## Pre-publication history

The pre-publication history for this paper can be accessed here:

http://www.biomedcentral.com/1471-2458/9/349/prepub

Publish with **BioMed Central** and every scientist can read your work free of charge

*"BioMed Central will be the most significant development for disseminating the results of biomedical research in our lifetime."*

Sir Paul Nurse, Cancer Research UK

Your research papers will be:

• available free of charge to the entire biomedical community

• peer reviewed and published immediately upon acceptance

• cited in PubMed and archived on PubMed Central

• yours — you keep the copyright

Submit your manuscript here:
http://www.biomedcentral.com/info/publishing_adv.asp

 **BioMed**central